RONY SAGY (State Bar No. 112219)
BARBARA L. GATELY (State Bar No. 76497)
SAGY LAW ASSOCIATES
930 Montgomery Street Suite 600
San Francisco CA 94133
rony.sagy@sagylaw.com
Tel: 415-986-0900
Fax: 415-956-3950

STEPHEN A. ROSENBAUM (State Bar No. 98634)
1716 Milvia Street
Berkeley, CA 94709
srosenbaum@law.berkeley.edu
Tel: 510-644-3971

Attorneys for Plaintiffs
MORGAN HILL CONCERNED PARENTS ASSOCIATION and
CONCERNED PARENTS ASSOCIATION

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| MORGAN HILL CONCERNED PARENTS ASSOCIATION, an unincorporated association, and CONCERNED PARENTS ASSOCIATION, an unincorporated association,<br><br>Plaintiffs,<br><br>v.<br><br>CALIFORNIA DEPARTMENT OF EDUCATION, and DOES 1 through 5,<br><br>Defendants. | CASE NO. 2:11-CV-03471-KJM-AC<br><br>**PLAINTIFFS MORGAN HILL CONCERNED PARENTS ASSOCIATION'S AND CONCERNED PARENTS ASSOCIATION'S BRIEF REGARDING THE PARTIES' RESPECTIVE RESPONSIBILITIES FOR COMPENSATING A SPECIAL MASTER**<br><br>Courtroom: 3<br>Judge: The Honorable Kimberly J. Mueller<br>Action Filed: April 23, 2012 |

**TABLE OF CONTENTS**

**Page**

**I. INTRODUCTION .......... 1**

**II. BACKGROUND OF THE PARTIES' DISCOVERY DISPUTES .......... 2**

**III. LEGAL ANALYSIS .......... 5**

**A. The Statutory Scheme .......... 5**

**B. Judicial Implementation of the Statutory Scheme .......... 6**

**1. Public Interest Cases .......... 6**

**2. A Disparity in Means .......... 8**

**3. The Relative Fault of the Parties .......... 9**

**4. Alternative Reference to a Magistrate .......... 10**

**IV. CONCLUSION .......... 10**

# TABLE OF AUTHORITIES

**Cases** **Page**

*Advanced Microtherm, Inc. v. Norman Wright Mech. Equip. Corp.*,
2008 WL 4626899, *1 (N.D.Cal. Oct. 17, 2008)........ 10

*Fund for Accurate and Informed Representation, Inc. v. Weprin*,
1992 WL 512410 (N.D.N.Y. Dec. 23, 1992)........ 7

*Gary W. v. State of La.*,
601 F.2d 240 (5th Cir. 1979)........ 6, 9

*Hart v. Community School Bd. of Brooklyn*,
383 F.Supp. 699 (E.D.N.Y. 1974) ........ 7

*Heiberg v. Hasler*,
1 F.R.D. 735 (E.D.N.Y. 1941) ........ 8

*Jackson v. Nassau Cnty. Bd. of Sup'rs*,
157 F.R.D. 612 (E.D.N.Y. 1994) ........ 7

*Morgan v. Kerrigan*,
530 F.2d 401 (1st Cir. 1976), cert. denied
426 U.S. 935, reh'g denied 429 U.S. 873 ........ 7

*Nat'l Ass'n of Radiation Survivors v. Turnage*,
115 F.R.D. 543 (N.D.Cal. 1987)........ 9

*PIC Group., Inc. v. LandCoast Insulation, Inc.*,
2011 WL 2669144 (S.D.Miss. July 7, 2011) ........ 9

*Reed v. Cleveland Bd. of Ed.*,
607 F.2d 737 (6th Cir. 1979)........ 7

*Sibley v. Sprint Nextel Corp.*,
298 F.R.D. 683 (D.Kan. 2014)........ 8

*Venture Global Engineering, LLC v. Satyam Computer Services, LTD*,
2014 WL 7013607, *6 (E.D. Mich. Dec. 11, 2014)........ 6

**Statutes** **Page**

Federal Rule of Civil Procedure 53........ 1, 6, 7

## I. INTRODUCTION

Plaintiffs Morgan Hill Concerned Parents Association and Concerned Parents Association offer this analysis in response to the Court's May 15, 2015 Order asking for simultaneous briefing on the question of who should be responsible for a special master's compensation. Plaintiffs believe that a consideration of all of the factors itemized in the federal rules, as filtered through a judicial lens, mandates that Defendant California Department of Education (CDE) assume full responsibility for the master's fees and costs.

Federal Rule of Civil Procedure 53(g)(3) directs the courts to consider a number of factors, including the respective means of the parties, and the relative fault of one party over the other in necessitating the reference. The Advisory Committee Notes expand on the statutory language to provide further guidance on the topic of allocation. Among other things, the Committee observed that parties pursuing relief in the public interest could deserve "special protection" and a party who had engaged in "unreasonable behavior" may properly be charged with all of the master's fees.

Plaintiffs are not-for-profit associations, composed of parents seeking to enforce the fundamental right of California's children with disabilities to a free appropriate public education, that subsist on the sacrifices and contributions of their members. They have no "means." Plaintiffs' counsel are comparably restrained in their ability to finance the services of a special master as they are presently receiving no compensation for their time or reimbursement for their costs. The CDE's 2014-2015 budget, by contrast, is over $76 billion.

The nature of this public interest litigation, and/or the gaping disparity between the parties' resources, either together or alone warrant an order charging the CDE with all of the master's fees. But a consideration of the CDE's unreasonable behavior throughout the course of discovery would resolve any doubt as to the equities of this result. As more fully detailed within, the CDE's responses to Plaintiffs' legitimate and *essential* discovery requests have been almost consistently characterized by extraordinary delay, obstruction and opacity. With the exception of 939 non-searchable, heavily redacted, and largely useless documents, the CDE has produced nothing in response to Plaintiffs' April 16, 2013 requests for production; it now contends that there are almost two terabytes of responsive data.

Plaintiffs believe that Mr. Krone has a unique background enabling him to understand and surmount the technical challenges the CDE has offered in excuse of its failure to move discovery, and this litigation, forward. That said, Plaintiffs would be pressed to move for the appointment of a magistrate as special master if charged with assuming a portion of Mr. Krone's fees. Plaintiffs believe that the circumstances overwhelmingly favor the allocation of Mr. Krone's compensation to the CDE alone.

## II. BACKGROUND OF THE PARTIES' DISCOVERY DISPUTES

This case has been pending for over three years and Plaintiffs have been waiting for responses to their initial requests for production for over two of those years. The pattern that has emerged over those years has been consistent: the CDE objects to all of the discovery requests; it invariably declines to meet and confer altogether or to meet and confer in good faith; its occasional promises to produce are later repudiated in whole or in part; and when it does produce documents they are not fully searchable, they are unreasonably redacted, and are at times unreadable rendering what little the CDE *has* produced meaningless. The CDE continues to withhold the vast majority of responsive documents.

The CDE's response to Plaintiffs' April 16, 2013 First Set of Requests for Production (First Set) captures the pattern. Well in advance of the CDE's date for responding, Plaintiffs invited the CDE to meet and confer to jointly craft a working protocol for producing the requested electronic discovery. Declaration of Rony Sagy (Sagy Dec.), ¶¶ 2, 3. The CDE never responded to Plaintiffs' invitation, then served identical boilerplate objections to 47 of the 48 requests on May 17, 2013. *Id.*, ¶ 4. Plaintiffs again suggested a face-to-face meeting to avoid judicial intervention. Following what Plaintiffs believed was a productive meeting at the AG's offices on June 26, 2013, Plaintiffs summarized the many points of agreement the parties had reached in a June 28, 2013 letter. *Id.*, ¶ 5, Exh. A. Less than two weeks later, on July 12, the CDE repudiated the itemized agreements stating that "while the parties had a productive discussion about the topics addressed in your letter, **neither party made firm contractual commitments** during this conference." *Id.*, ¶ 6, Exh. B, emphasis added. The CDE never fulfilled the promises it made during that meeting, nor did it respond to Plaintiffs' requests that it identify which of the topics discussed at the June 26 meet and

confer did not rise to the level of an "agreement." *Id.,* ¶ 7, Exh. C.

On July 12, 2013, the CDE produced 939 non-searchable documents from which all metadata had been stripped; some of these documents were also black with redactions, including student names, student IDs, the names of parents, teachers, service providers, school districts, schools and SELPAs. The redactions, Plaintiffs observed, thwarted any efforts to follow the progression of individual students through the CDE's educational system. The CDE would not engage in a substantive dialogue regarding the provision of notice, coupled with the existing protective order, as obviating the need for the blanket redactions. *Id.,* ¶ 6.

Almost a year after materials responsive to the First Set were due, the CDE's counsel informed Plaintiffs that the CDE had engaged a vendor to "pull the data from its original sources so that it can be produced in an organized manner . . . . Once I have an estimate on when we can begin a rolling production of the information, I will let you know." *Id.,* ¶ 8, Exh. D. The CDE never provided an estimate for its intended compliance with the outstanding discovery, nor has it produced any further materials in response to the First Set.

In its contribution to the March 12, 2015 Joint Statement, the CDE wrote that it is "in the process of transferring almost two terabytes of data from the CDE's network drives to the AGO's discovery platform, Concordance . . . . Barring any unforeseen circumstances, this staggering amount of data is expected to be fully transferred to the AGO within six months," that is, by September 15, 2015—two and a half years after Plaintiffs' initial requests. *Id*. Plaintiffs do not dispute CDE's claim that the amount of data responsive to the First Set is "staggering." They simply question why the CDE did not undertake these efforts to retrieve responsive data before March 2014, and why 18 months are now needed to retrieve two terabytes of data. It is Plaintiffs' perception that the CDE has never exhibited any sense of urgency in either identifying or retrieving the materials Plaintiffs have long sought.

This pattern repeated itself when Plaintiffs propounded their Second Set of Requests for Production on August 20, 2013 (Second Set) seeking the production of all of the CDE's databases. The CDE first interposed objections to all of the Plaintiffs' requests. It then provided piecemeal responses over a 15-month period. Instead of producing the databases themselves, as requested,

and without first consulting with Plaintiffs, the CDE offered materials that had been extracted from some of its databases. The extracted material reflected the same expansive set of redactions that has robbed its entire production of any utility. The CDE resisted Plaintiffs' efforts to meet and confer until the Court issued its February 10, 2015 Order directing the parties to meet and address the question of notice and other technical issues. *Id.*, ¶9.

In response to the Court's order, Plaintiffs' counsel hosted a meeting on February 26 in their San Francisco offices, and the AG's office hosted the second meeting in Sacramento on March 2, 2015. In addition to refusing to allow its only expert[1] at the meeting to respond to Plaintiffs' questions regarding the structure, nature, maintenance and substance of the CDE's databases, the CDE declined to engage in a discussion regarding notice until the last fifteen minutes of the second session. It then professed to be unprepared to address any notice methodologies the CDE had used in the past, including parent reach-outs. It promised to seek responsive data on the topic of parent reach-outs. *Id.*, ¶¶10-11.

Plaintiffs propounded special interrogatories on March 5, 2015 seeking, among other things, information that the CDE had either refused to permit its expert to provide or information it had promised to subsequently convey but did not. Aside from perfunctory, boilerplate objections (e.g. stating that the defined term "notice" is overbroad, vague and ambiguous), the CDE has not responded to the interrogatories. Following a brief but ineffective meet and confer dialogue, the CDE's counsel stated on May 18 that Plaintiffs would receive the CDE's responses "just as soon as CDE has assembled them." *Id.*, ¶¶11-13 Exh. E. As of the date of this submission, Plaintiffs have received no substantive responses from the CDE.

## III. LEGAL ANALYSIS

### A. The Statutory Scheme

Federal Rule of Civil Procedure 53(a)(3) provides that, "[i]n appointing a master, the court must consider the **fairness** of imposing the likely expenses on the parties and must protect against

---

[1] In addition to the one technical expert CDE brought to the meeting, its team consisted of three lawyers (two from the AG's office and one from the CDE's in-house office) and two litigation support personnel employed by the AG. A fourth lawyer from the AG's office attended the second meeting for a short while.

unreasonable expense or delay." Emphasis added. Rule 53(g)(3) instructs:

> The court must allocate payment among the parties after considering **the nature and amount of the controversy**, **the parties' means**, and the extent to which any **party is more responsible than other parties** for the reference to a master. An interim allocation may be amended to reflect a decision on the merits.
>
> Emphasis added.

The Advisory Committee Notes for the 2003 Amendment of Rule 53 provide further guidance on the question of allocation:

> Payment of the master's fees must be allocated among the parties and any property or subject-matter within the court's control. The amount in controversy and the **means of the parties** may provide some guidance in making the allocation. The **nature of the dispute** also may be important—**parties pursuing matters of public interest, for example, may deserve special protection**. A party whose **unreasonable behavior** has occasioned the need to appoint a master, on the other hand, may properly be charged all or a major portion of the master's fees. It may be proper to revise an interim allocation after decision on the merits. The revision need not await a decision that is final for purposes of appeal, but may be made to reflect disposition of a substantial portion of the case.
>
> Emphasis added.

Each of the itemized factors favors the allocation of all costs and fees to the CDE. First, it is self-evidently not "fair" to impose substantial costs on the Plaintiffs' members who are selflessly pursuing this matter of "public interest" on behalf of themselves and other parents of children with special needs throughout the State of California. Second, the disparity in the "means of the parties" is equally apparent. Plaintiffs have no means other than the generosity of their members. In contrast, the CDE's 2014-2015 budget includes more than $45 billion in General Fund resources and totals $76.6 billion when funds from other sources are factored in. Cal. Dept. Educ., Education Budget, 2014-2015, www.cde.ca.gov/fg/fr/eb/. Third, there is no parity in blame for having to refer these discovery disputes to a special master. In the preceding section, Plaintiffs outline a history of obstructionist and evasive conduct by the CDE in kicking the discovery can down the road. Plaintiffs have still not received documents responsive to discovery requests propounded over two years ago. The CDE's behavior, by any measure, has been "unreasonable."

### B. Judicial Implementation of the Statutory Scheme

The case law fully vindicates Plaintiffs' position. Though there are many cases in which the courts have allocated the special master's costs evenly between the parties, Plaintiffs are unaware of any cases that reach that result where the plaintiffs are prosecuting claims to advance a public interest and/or where there is such a wide disparity between the means of the parties and/or where one party has so plainly created the need for the reference.[2] Plaintiffs offer the following analyses on a point-by-point basis.

#### 1. Public Interest Cases

Cases seeking to combat desegregation, racial discrimination, and discrimination against children with cognitive disabilities, among others, have all allocated the full brunt of the special master's costs to the governmental defendants. In *Gary W. v. State of La.*, 601 F.2d 240 (5th Cir. 1979), plaintiffs—all "mentally retarded" and "emotionally disturbed" children—sued the State of Louisiana for violating their statutory and constitutional rights by placing them in Texas institutions. The district court found that the state had violated the children's rights and ordered the state to "provide each child with care, education, medical and personal treatment suited to his characteristics and needs." *Id.* at 242. When the state had made no measurable progress in implementing the court's directives, plaintiffs filed a motion for the appointment of a special master. The district court granted the motion and assessed all of the costs of the special master against the state.

The Fifth Circuit concluded that the allocation was without error, observing that the state had been found to have violated the children's constitutional and statutory rights and had failed to substantially comply with the court's order. *Id.* at 246. Though the court did not directly address other Rule 53(g)(3) factors, it is apparent that there was considerable disparity between the means

---

[2] The even allocation between the parties almost uniformly arises in the context of lawsuits pitting one large entity against another. *See, e.g., Venture Global Engineering, LLC v. Satyam Computer Services, LTD,* 2014 WL 7013607, *6 (E.D. Mich. Dec. 11, 2014) [In approving a 50/50 allocation of the costs for the special master, the District Court observed that the dispute was "part of a multi-million dollar case, and the corporate parties both have the means to compensate the special master."]

of the children and the State of Louisiana and the case was being prosecuted to advance the public interest.

The Eastern District of New York shined a light on the need to consider the nature of the dispute in considering a special master's compensation. In *Jackson v. Nassau Cnty. Bd. of Sup'rs*, 157 F.R.D. 612 (E.D.N.Y. 1994), the court had concluded that the weighted voting system used by Nassau County was unconstitutional and ordered the county to bring the system into compliance. When the county had not devised a compliant voting system in a timely manner, the court appointed a special master and directed Nassau County to assume full responsibility for the master's compensation. In considering the master's fees, the court noted that the case involved "public institutional relief and service to the public," warranting special consideration. *Id.* at 623.

In *Hart v. Community School Bd. of Brooklyn*, 383 F.Supp. 699 (E.D.N.Y. 1974), the district court found that defendants contributed to the unlawful racial discrimination that necessitated the suit and appointed a special master to craft a remediation plan. In assessing 100% of the special master's compensation against the defendants, the court observed, first, that a determination as to who should be charged with assuming the master's expenses rests in the discretion of the district court, subject to review in case of abuse. *Id.* at 767. Second, it concluded that only one party had the means to compensate the master: "[I]t was proper to award the costs of the master and the supportive services he requires against the defendant with the funds available to pay—here, the Chancellor of the Board of Education of the City of New York." *Id.*

In another school desegregation case, this time in Boston, the School Committee challenged the district court's order that it assume all of the costs of the special master. In *Morgan v. Kerrigan*, 530 F.2d 401, 427 (1st Cir. 1976), cert. denied, 426 U.S. 935, reh'g denied 429 U.S. 873, the First Circuit concluded that the allocation of all of the master's compensation to the School Committee was not an abuse of discretion. In both cases, the unstated subtext was the vast disparity between the parties' respective means and the nature of both lawsuits as vindicating public rights. *Accord: Reed v. Cleveland Bd. of Ed.*, 607 F.2d 737, 743 (6th Cir. 1979) ["The City and State defendants were made jointly liable and the [special master] fees were ordered to be paid forthwith."]

In *Fund for Accurate and Informed Representation, Inc. v. Weprin,* 1992 WL 512410 (N.D.N.Y. Dec. 23, 1992), a number of individuals and small organizations challenged the constitutionality of New York's reapportionment plan based on the 1990 census. The district court retained a special master to assist it in evaluating the parties' respective claims. The court ultimately concluded that the reapportionment plan passed constitutional muster but found that the action was "brought in good faith and the parties who challenged the reapportionment, while unsuccessful, presented credible arguments." *Id.* at *5.

The district court ordered that all costs and expenses of the special master be paid by the State of New York: "This direction reflected the court's belief that the burden should be spread among all New Yorkers, instead of concentrated among a few small groups, since this litigation was brought to benefit all New Yorkers." *Id*. Plaintiffs are prosecuting their claims on behalf of all of California's children with special needs and are entitled to the same deference in the allocation of the master's fees.

**2. A Disparity in Means**

Courts outside the context of public interest lawsuits have also imposed liability for the full extent of the special master's compensation where there is a gap in the parties' ability to pay. In *Heiberg v. Hasler,* 1 F.R.D. 735 (E.D.N.Y. 1941), the plaintiff sued her employer for injuries sustained in a car accident while she was acting as the employer's personal attendant. The defendant requested a special master to resolve a pivotal question of fact. The district court granted the defendant's request, stating that the defendant would be charged with assuming the full cost of the master's compensation: "[A]s the plaintiff is in humble circumstances, and the defendant's showing by her affidavit in a companion motion, is one of affluence, the fees and stenographer's charges for minutes would have to be paid by her in the first instance, with ultimate allocation as may seem to be fair when the case has come to a close." *Id.* at 737.

Likewise, in *Sibley v. Sprint Nextel Corp.*, 298 F.R.D. 683, 688 (D.Kan. 2014), the district court of Kansas concluded that splitting the cost of the special master's compensation was not appropriate where the parties had dramatically different access to resources: "Sprint had operating revenues in 2012 in excess of $35 billion, while the average annual compensation of a Sprint

sales representative during the class period was about $37,000." This is to be contrasted with the CDE's operational budget in excess of $76 billion and the Plaintiffs' utter lack of income or resources.

**3. The Relative Fault of the Parties**

Many cases focus on the relative culpability of the parties in necessitating the appointment of a special master alone when determining an appropriate allocation. In *PIC Group, Inc. v. LandCoast Insulation, Inc.*, 2011 WL 2669144 (S.D.Miss. July 7, 2011), defendant had failed to produce relevant ESI in a timely fashion and later deleted ESI in violation of a court order. The district court concluded that the defendant's conduct had caused the court to expend an inordinate amount of time adjudicating a discovery matter that necessitated the reference: "Therefore, it is only just that Defendant bear the costs of its actions: the Special Master's fees and expenses." *Id.* at *10. *See also Nat'l Ass'n of Radiation Survivors v. Turnage*, 115 F.R.D. 543, 561-564 (N.D.Cal. 1987) [Defendant Veterans Administration's "reckless pretrial conduct" warranted its order that the VA pay the entirety of the fees and expenses of the special master.]

Plaintiffs submit that the CDE's pretrial conduct in responding to discovery strictly on its own terms and without regard to excessive delays would, on its own, support the allocation of 100% of the special master's compensation to the CDE. At the root of the parties' ongoing discovery disputes is the CDE's stubborn adherence to the plainly erroneous notion that FERPA prevented it from releasing student information. Had the CDE met and conferred with Plaintiff in good faith on the pivotal question of notice at the outset, Plaintiffs believe that there would have been no need for a special master in the first instance. The CDE has exacerbated that fundamental failure by willfully ignoring discovery deadlines, repudiating discovery agreements and continuing to withhold responsive data.

**4. Alternative Reference to a Magistrate**

Plaintiffs fully endorse the appointment of Mr. Krone to take on the discovery challenges outlined by the Court. Were the Court to allocate some of Mr. Krone's expenses to Plaintiffs, on the other hand, they would have no choice but to notice a motion either opposing, or requesting the dismissal of, the special master and referral to a Magistrate Judge to handle the parties'

discovery disputes. *See Advanced Microtherm, Inc. v. Norman Wright Mech. Equip. Corp.*, 2008 WL 4626899, *1 (N.D.Cal. Oct. 17, 2008)

## IV. CONCLUSION

For all of the foregoing reasons, Plaintiffs respectfully request that the Court enter its order directing the CDE to assume all of the costs and fees associated with the appointment of a special master in this action.

DATED: June 5, 2015

SAGY LAW ASSOCIATES

By: /S/ Rony Sagy
RONY SAGY

Attorneys for Plaintiffs MORGAN HILL CONCERNED PARENTS ASSOCIATION and CONCERNED PARENTS ASSOCIATION