SAGY LAW ASSOCIATES

October 12, 2015

The Honorable Kimberly J. Mueller
United States District Court Judge
District Court for the Eastern District of California
Robert T. Matsui United States Courthouse
Courtroom 3, 15th Floor
501 I Street
Sacramento, CA 95814-7300

    Re: *Morgan Hill Concerned Parents Assn. v. California Dept. of Education*
        Case No. 2:11-CV-03471-KJM-AC

Dear Judge Mueller:

We have received and reviewed the Proposed E-Discovery Protocol (Protocol) developed by the Special Master in this matter in consultation with the parties. We believe the Protocol addresses, and has the potential to resolve, most of the discovery issues that have prevented discovery from moving forward in this matter for so long. Plaintiffs perceive the CDE's outstanding objections to the Protocol, particularly its last-minute objection to all of Plaintiffs' requests as being beyond the "scope of production," as posing the principal obstacle to the Protocol's achievement of its full potential.

The CDE's objections to discovery in this litigation have been a moving target since its inception in April 2013, and if left unchecked, would effectively nullify the Special Master's proposed Protocol and any and all discovery in this matter.

Plaintiffs are concerned that CDE's approach to the Special Master's assigned tasks is simply another step in the continuum of conduct it has employed since the inception of this litigation to avoid, or at least delay, any progress. Plaintiffs accordingly ask that the Court quickly join and resolve this pivotal issue.

A.    **Plaintiffs' Responses to the CDE's Evolving Objections**

    1.    **Scope of Production.** The Protocol's Introduction touches on a point of controversy that the CDE has only recently raised—the "scope of production," a matter that the Special Master characterizes as a question of law for resolution by the Court. Plaintiffs agree that a speedy resolution of CDE's amorphous, and undefined, objections is essential to *any* meaningful progress in the currently stalemated path to discovery.

        a.    **History of CDE's Objections.** In responding to Plaintiffs' initial requests for production of documents, CDE interposed boilerplate objections to all of Plaintiffs' requests stating that they were "vague," "overly broad" and "unduly burdensome." CDE opposed Plaintiffs' November 12, 2014 motion to compel production of documents by stating that the

Plaintiffs' requests were "vastly overbroad" in nature, implicating 170 email custodians and 1.8 terabytes of information. CDE's opposition to the motion to compel did not allude to an objection based on the "scope" of production and, in fact, concluded with an agreement to produce everything Plaintiffs' requests sought (though it continued to insist on a heavily redacted production). As the Court knows, CDE has produced nothing of substance to date.

For the first time, in its May 22, 2015 brief regarding notice, CDE raised the notion of an objection based on "scope." There, CDE argued that the Plaintiffs' website reflected members in only seven school districts, suggesting that production should be restricted to those seven districts. Then, at a June 30, 2015 Status Conference before the Court, counsel for CDE stated that "there [was] a dispute as to the scope of relevance and the discovery in this case." Status Conference Transcript, p. 19. Counsel suggested that the relevant scope should be limited to the 17 children referenced in the First Amended Complaint—children that the Court expressly acknowledged were merely "examples" of the systemic claims alleged in the FAC in denying CDE's Motion to Dismiss. Order Denying Motion to Dismiss, ECF 25, 15:19-21. In other discussions with Plaintiffs, CDE has suggested that the scope should be restricted to the children represented by members of the two associational Plaintiffs. As discussed below, this Court's March 29, 2013 Order dispositively resolved the question of associational standing in Plaintiff's favor.

        **b.**    **Plaintiffs' Efforts to Elicit the Basis of the CDE's Scope Objections.**
In an attempt to elicit the precise parameters of the CDE's objections based on "scope," Plaintiffs sent a July 14, 2015 letter to CDE asking that it define its "scope" objections with specificity. CDE responded ten days later by directing Plaintiffs to their recent briefings regarding "notice and consent and the allocation of the special master's fees," citing ECF No. 104 at 3-4 and ECF No. 108 at 3-4.

In ECF 104, CDE first argued that Plaintiffs' discovery requests implicate a voluminous number of data points, explaining that the number of affected students is near ten million and that the requests span over 1,000 school districts and 10,000 schools, and noting that CDE has collected 1.8 terabytes of data from the network drives.[1] CDE also revived its argument regarding standing, observing that the Plaintiffs' members represent "only a handful of school districts." The standing issue was resolved by this Court on March 29, 2013, over two and a half years ago. ECF 25, 13:11. Even assuming for purposes of the notice motion that the Plaintiffs had associational standing, "which the CDE does not concede, the standing is very limited." ECF 104 at 3-5. The CDE does not elaborate on the implication of the so-called "limited" standing or what effect, if any, it had on the scope of discovery.

---

[1] The Special Master has observed that the purportedly unwieldy size of the compiled database is directly traceable to CDE's "decision to collect and process all existing data at the Special Education Division of CDE." Protocol at 11. CDE could have devised with Plaintiffs a search protocol designed to harvest only relevant data.

In ECF 108, CDE reiterates its arguments regarding the voluminous datapoints (the consequence of CDE's decision to collect *all* data from the Special Education Division, as noted in Note 1, below) and suggests that it would be appropriate for the Plaintiffs to narrow their "requests to the specific students whose parents are members, their specific disabilities, or their specific school districts." ECF 108, 26-27. Again, this argument ignores this Court's March 29, 2013 Order.

        c.      **The Need for Judicial Guidance on Scope.** It is imperative that CDE be compelled to specifically define, and be prepared to substantiate by reference to legal authority, any objections it relies upon to limit the production contemplated by the proposed Protocol. If the thrust of CDE's objection is the voluminous nature of the datapoints, Plaintiffs respond that well designed and formulated searches of the SED database (for which we anticipate guidance from the Special Master) should neutralize that basis for objecting. If CDE is indeed reviving its argument that Plaintiffs lack standing, that argument has already been considered, and rejected, by the Court. ECF 25, 13:11. Plaintiffs ask that CDE's objections be quickly joined and resolved as no meaningful discovery can proceed under CDE's present view of its discovery obligations.

        2.      **No Back-Ups.** In another "first," the CDE has just now taken the position that it has no back-ups for any of the information stored on its massive databases and that none of the databases track changes to their format or data entries. The Special Master has intimated his skepticism of CDE's position on this point by observing that he has "not had an opportunity to meet with the CDE's technical staff to discuss this specific issue and confirm the CDE's explanation." Plaintiffs share the Special Master's skepticism and observe that, if true, it would represent a violation of CDE's legal obligations to preserve "what it knows, or reasonably should know, is relevant in the action, is reasonably calculated to lead to the discovery of admissible evidence, is reasonably likely to be requested during discovery, and/or is the subject of a pending discovery request." *Wm. T. Thompson Co. v. General Nutrition Corp., Inc.,* 593 F.Supp. 1443, 1455 (C.D.Cal. 1984).

It is absolutely essential that Plaintiffs have access to the databases as they existed before this litigation was commenced and that they be able to track the changes to the databases over the years. It is inconceivable that CDE's IT personnel would not create back-up tapes of data that is essential to the functioning of its Special Education Division.

        3.      **CDE's Purported Inability to Prioritize Production.** The Special Master asked Plaintiffs to identify those SED custodians for whom production and review represents Plaintiffs' highest priority. Plaintiffs produced a list and shared it with the Special Master on September 8, 2015. CDE now takes the position that "because of the way that they collected the data, CDE is not able to identify individual custodians so as to prioritize processing/searching." Protocol, at 9. The Special Master again expressed open skepticism, observing that CDE would never know if all of the SED employee's mailboxes had been collected if it couldn't identify *which* mailboxes had been collected. Plaintiffs join in the Special Master's exhortation "strongly suggest[ing] that CDE reassess their ability to identify individual employee email (and home network shares) and meet with the Special Master to determine if identification/searching is in fact possible." If, as

both the Special Master and Plaintiffs strongly suspect, Priority employees can be identified, Plaintiffs could immediately undertake the searches contemplated by the Protocol.

4. **Discovery Frozen as of January 2014.** The CDE has stated that its collection of data from the SED network drives was completed in January 2014. After a number of false starts, CDE is now continuing to upload the data to its latest litigation platform, stating that collection will not be complete for another 5 months—that is, until March 2016. That means that the data produced in response to the 2013 discovery requests, to which the CDE has promised access in March 2016, will already be over two years old at the time of access. As discussed, *infra*, at page 5 (Section B.1), CDE is under a continuing obligation to update its discovery obligations. Plaintiffs submit that CDE's obligations to collect data from the SED network drives is ongoing and cannot be deemed to have been suspended at a momentary point in time.

5. **The CDE's Efforts to Condition Production on the Availability of "Suitable Media."** The CDE has apparently requested that its obligation to produce responsive documents be conditioned on the "availability of suitable media to store and transfer the production" of its responsive data. The request is symptomatic of the CDE's utter lack of commitment to an orderly process of discovery. A 2 terabyte external hard drive costs $70 and is widely available. The Special Master was correct in dismissing the CDE's request as "not reasonable given the delays to date in the case and the relatively low cost of storage media." Protocol at 10.

6. **CDE's Objections to Producing STAR Database.** The CDE has objected to the production of the STAR database on the basis that the "raw reports" are in the possession of the Educational Testing Service (ETS). The Protocol requests that CDE produce the raw reports to the extent they are under the control of the CDE. CDE objects to the production of the raw reports on the further ground that they would reveal proprietary information about the test. Plaintiffs remind CDE that there is a Protective Order already in place in this case. CDE also objects to the production of any Extracted Data on the grounds that it is duplicative and not altered in any way from the data found in CALPADS. Plaintiffs disagree with CDE's objections, but will reserve their response to CDE's objections in this regard until they have a better understanding of what CDE *will* produce.

7. **CDE's Objections to Producing OAH Reports.** CDE denies that it is the custodian of, nor does it possess special access to, the administrative hearings database. Plaintiffs will attempt to obtain the hearings reports directly from the Office of Administrative Hearings and will revisit this issue only if it is unsuccessful in those efforts.

8. **CDE's Efforts to Retract Discovery Already Produced.** The CDE has suggested to the Special Master that its obligation to provide the 939 documents already produced to Plaintiffs on July 12, 2013, in the format agreed to by the parties, is "subject to their identification by the search terms ultimately agreed to be the parties." Plaintiffs suggest that CDE's position in this regard is meaningful only to the extent it epitomizes its bad faith tack in responding to discovery in this litigation. Plaintiffs join in the Special Master's perfunctory dismissal of CDE's effort to reclaim discovery already produced.

B.  **Plaintiff's Proposed Clarifications to the Protocol**

1.  **Duty to Update Discovery.** In many instances, the Protocol proposes a series of steps to be taken by CDE in response to Plaintiffs' discovery requests that culminate with the phrase "production of [X] will be complete." Protocol at 3. Rule 26(e) of the FRCP imposes an ongoing obligation on a party responding to discovery to supplement or correct its responses "in a timely manner" when it becomes apparent to the party that the response is incomplete in some material respect. Given CDE's representation that it modifies its databases on a yearly basis and the nature and duration (both accrued and anticipated) of this litigation, the obligation to timely update CDE's discovery responses is particularly acute. Plaintiffs propose that the following qualifying language be appended after "complete": subject to CDE's obligations to update its production and related Documentation, at least once a year.

2.  **Production of Databases in Dual Formats.** The Protocol provides that CDE will provide the SESR/VR database by *either* producing a copy of the SESR/VR as a SQL server database *or* as an extracted summary file. To the extent both formats already exist, Plaintiffs propose that CDE produce the database in both formats as cross-referencing could maximize Plaintiffs' experts' ability to efficiently obtain the data they need.

3.  **Open-Ended Deadlines.** There are a number of Protocol provisions that depend on CDE's internal calculations to trigger the running of a deadline. For instance, paragraph (7) of "II. Email/Networkfiles" provides that "[u]pon completion of the searching of any particular data set, CDE shall have 45 days to review all search results . . . ." Given the history of this litigation, Plaintiffs believe that it is essential that all deadlines be tied to an objectively ascertainable benchmark.

4.  **Production of "Documentation" Associated with Databases.** The Protocol proposes a seriatim production of information in connection with the databases commencing with the production of the databases themselves. To the extent there is "Documentation" associated with the databases, as defined in the Protocol itself, Plaintiffs propose that the CDE produce that documentation as soon as it is available rather than waiting for the production of the databases.

C.  **The Need to Identify Reasons for Objecting to Disclosure of Student Information**

The Protocol states that the parties have elected to delay finalizing the wording of the FERPA Notice until the "scope of production" has been finally determined. It notes that one of the outstanding differences between the parties on the question of the Notice's wording is the CDE's insistence that a Notice recipient's designation of reasons for opposing the disclosure of Private Identifying Information be deemed "optional." Plaintiffs believe that it is essential that parents articulate the reasons for their objections for a number of reasons. First, once articulated, it could be that the objection is illusory if, for instance, the parent did not understand that there is a protective order and other safeguards in place. Second, the designation of reasons decreases the likelihood that large numbers of uninformed parents would be solicited by interested parties to

place their signatures on an objection form, without gaining a full understanding of its significance. Third, and importantly, without a stated reason for their objections, the Court is unable to evaluate the legitimacy of the parents' position.

Sincerely,

*Rony Sagy*

Rony Sagy