UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MORGAN HILL CONCERNED PARENTS ASSOCIATION, et al.,<br><br>Plaintiff,<br><br>v.<br><br>CALIFORNIA DEPARTMENT OF EDUCATION, et al.,<br><br>Defendants. | No.  2:11-cv-3471 KJM AC<br><br><br>ORDER |

Plaintiffs – two associations of parents of children with disabilities – allege that defendant is violating the Individuals with Disabilities Education Improvement Act, 20 U.S.C. §§ 1400, et seq., through its systemic failure to provide a "free appropriate public education" ("FAPE") to children with disabilities.  Pending before the undersigned are (1) plaintiffs' motion to compel and for sanctions (ECF No. 273), and (2) defendant's cross-motion for a protective order and for sanctions (ECF No. 272).

These motions were referred to the undersigned by E.D. Cal. R. ("Local Rule") 302(c)(1) and ECF No. 205.  For the reasons set forth below, (1) plaintiffs' motion to compel will be granted, but their motion for sanctions will be denied without prejudice to its renewal using Sacramento rates for attorneys' fees, and (2) defendant's motion for a protective order will be denied, and its motion for sanctions will be denied.

1

1   I.  NATIVE FORMAT AND METADATA

2          Plaintiffs move to compel CDE to produce emails in "native" format with all metadata

3   attached.  ECF No. 273 at 1-2.[1]  CDE moves for a protective order against the production of

4   electronically stored information ("ESI") in native format, arguing that the documents have

5   already been produced in "the industry standard load format," and that "producing documents in

6   their native format would infringe on the deliberative process, attorney-client, and attorney work

7   product privileges."  ECF No. 272 at 1, 3.  Defendant also seeks a protective order stating that

8   "the burden of producing the requested metadata outweighs any probative value."  Id. at 3.

9          "Native" format is either (1) the form or forms in which the ESI is ordinarily maintained,

10  as provided by the Federal Rules,[2] or (2) the associated file structure defined by the original

11  creating application.[3]  These definitions are not contradictory, as ESI may be produced in one

12  form or forms, but routinely stored or maintained in another form.  Plaintiffs have requested, and

13  now move to compel, production in "native" format.  Defendant has not produced the ESI in

14  native form, instead choosing to produce it in "load file" format.

15         Metadata is information about the ESI, as opposed to its contents.  Resnick v. Netflix, Inc.

16  _____

17  [1]  Plaintiffs make reference to productions of other electronically stored information ("ESI") that
    preceded the email productions addressed in this motion, but it appears that those documents were
18  also emails or attachments to emails.  See ECF No. 274-1 at 71 (referring to non-database
    productions).  On June 3, 2016, the court ordered the parties to provide the court with the cover
19  letters accompanying each discovery production.  ECF No. 189.  As a result, the court is aware
    that CDE made a production of non-email ESI on or about July 29, 2016.  However, plaintiffs
20  have not asserted in this motion that this production was defective, and the court therefore does
    not consider it here.
21  [2]  Fed. R. Civ. P. ("Rule") 34(b)(2)(E)(ii) (if no production format is specified, ESI should be
    produced "in a form or forms in which it is ordinarily maintained …").
22  [3]  "Electronic documents have an associated file structure defined by the original creating
    application.  This file structure is referred to as the native format of the document."  The Sedona
23  Conference, The Sedona Conference Glossary: E-Discovery & Digital Information Management
    ("Sedona Glossary"), 15 Sedona Conf. J. 305, 341 (4th Ed. 2014) (A Project of the Sedona
24  Conference Working Group on Electronic Document Retention & Production (Wg1)) (available
    on WestLaw and Lexis Advance).

25  The Sedona Conference describes itself as "a nonprofit, 501(c)(3) research and educational
    institute dedicated to the advanced study of law and policy in the areas of antitrust law, complex
26  litigation, and intellectual property rights."  See https://thesedonaconference.org (last visited by
    the court on January 31, 2017).  Both sides in this dispute have relied upon The Sedona
27  Conference as being authoritative in the area of discovery of electronically stored information
    ("E-Discovery"), and the Ninth Circuit has relied upon the Sedona Glossary.  See Resnick v.
28  Netflix, Inc. (In re Online DVD-Rental Antitrust Litig.), 779 F.3d 914, 929 n.8 (9th Cir. 2015).

1   (In re Online DVD-Rental Antitrust Litig.), 779 F.3d 914, 925 (9th Cir. 2015) ("Metadata is

2   simply data that provides information about other data.  It is '[s]econdary data that organize,

3   manage, and facilitate the use of primary data.'") (quoting Black's Law Dictionary 1141 (10th ed.

4   2014)) (citations and some internal quotation marks omitted).[4]

5            A.  Discovery Requests at Issue and Objections

6            The Federal Rules of Civil Procedure have been updated to address issues specific to the

7   discovery of electronically stored information ("ESI").  Specifically, they provide that the

8   requester of such information "may specify the form or forms in which electronically stored

9   information is to be produced."  Rule 34(b)(1)(C).  If the responding party objects to the

10  requested format, it files an objection to format, and it must state the form it intends to use.

11  Rule 34(b)(2)(D).  "If the requesting party is not satisfied with the form stated by the responding

12  party, or if the responding party has objected to the form specified by the requesting party, the

13  parties must meet and confer under Rule 37(a)(2)(B) in an effort to resolve the matter before the

14  requesting party can file a motion to compel."  Fed. R. Civ. P. 34 advisory committee's note to

15  2006 Amendments.

16                1.  April 16, 2013 document requests

17            On April 16, 2013, plaintiffs served their First Set of Requests for Production of

18  Documents ("First Set").  See ECF No. 274-1 (Exhibit 1 to Declaration of Rony Sagy) ("Sagy

19  Exh. 1, ECF 274-1") at 13-30.  The request specified that the ESI should be produced "in their

20  native electronic format together with all metadata and other information associated with each

21  document in its native electronic format."  Sagy Exh. 1, ECF 274-1 at 17 ¶ 4 (instructions).

22                2.  May 17, 2013 objections

23            On May 17, 2013, CDE responded to plaintiffs' First Set.  See Sagy Exh. 2, ECF 274-1

24  at 33-64.  CDE did not object to the instruction that ESI be produced in native format with all

25  metadata attached, and it did not propose any other format for producing the ESI.  See id.

26            Instead, CDE interposed objections to nearly every individual request in the First Set on

_____

27  [4]  See also, Sedona Glossary, 15 Sedona Conf. J. at 339 (metadata is "[t]he generic term used to
    describe the structural information of a file that contains data about the file, as opposed to
28  describing the content of a file").

3

1   the grounds that they were "unduly burdensome,"[5] "not relevant to the present litigation,"[6] and

2   protected by the attorney client and deliberative process privileges[7] (and other grounds not raised

3   in this motion).  See Sagy Exh. 2, ECF 274-1 at 33-64.

4                    3.   October 10, 2013 letter – defendant's claimed "objection" to format

5            On October 10, 2013, CDE submitted a proposed protective order to the court.  See ECF

6   No. 277-2 (Exhibit A to Declaration of Julia Jackson) ("Jackson Exh. A, ECF 277-2") at 5.  In its

7   transmittal document, CDE "observe[d]" that "the question whether to produce metadata

8   generally involves a balancing test …."  Id.  CDE claims that this constitutes its objection "to the

9   production of ESI in native format."  ECF No. 277 at 8.  It further argues that "[b]ecause

10  metadata in native documents cannot be redacted or withheld (Cotulla Decl. ¶ 13), a native file

11  production necessarily includes metadata fields that may be protected by the deliberative process,

12  attorney-client and attorney work product privileges."  Id.

13                   4.   August 26, 2016 letter

14           On August 26, 2016, CDE wrote to plaintiffs, and for the first time, specifically objected

15  to producing ESI in native format.  Sagy Exh. 8, ECF 274-1 at 89.  According to CDE, they have

16  produced ESI "as load files, a standard format approved by the Special Master on April 7, 2016."

17  Id.; ECF No. 272-1 at 2-3.  CDE argues that "[a] requesting party cannot demand production in

18  one format versus another just because one would allegedly ease a party's review process."  Id. at

19  89-90, citing United States ex rel. Carter v. Bridgepoint Education, Inc., 305 F.R.D. 225 (S.D.

20  Cal. 2015).

21       B.   Meet and Confer

22           The parties met and conferred on the format of production issue on October 26, 2016,

23  without success.  Declaration of Rony Sagy ("Sagy Declaration") (ECF No. 274-1) at 5 ¶ 23;

24  Declaration of Julia Jackson ("Jackson Decl.") (ECF No. 277-1) ¶ 24.

25

26  _____
    [5] This objection was not asserted in response to Request Nos. 40, 48.
27  [6] This objection was not asserted in response to Request No. 40.
    [7] These objections were not asserted in response to Request Nos. 40, 48.  In addition, as
28  discussed more fully below, none of these privilege objections were accompanied by the privilege
    log that is required by Fed. R. Civ. P. 26(b)(5)(A)(ii).

                                        4

C. Arguments

    1. Plaintiffs

Plaintiffs, as the requesting parties, are entitled to specify the format in which ESI is to be produced, under Fed. R. Civ. P. 34.  ECF No. 274 at 19-21.  Plaintiffs specified that ESI should be produced in native format with all metadata attached.  If defendant objected to that format, it was obligated to state its objection and to propose an alternate format.  Defendant neither objected to the format nor proposed an alternative, and accordingly it waived any objections to format.

Instead, defendant produced ESI in an unusable "load file" format.  Even if defendant was entitled to ignore plaintiffs' format request, it was still obligated to choose a format that was usable.

    2. Defendant CDE

CDE was entitled to disregard plaintiffs' request that ESI be produced in native format with all metadata attached, since it produced it in a "reasonably usable" form that did not "remove or degrade the searchability of the data."  ECF Nos. 272-1 at 6, ECF 277 at 12.  CDE timely objected to production in native format, informed plaintiffs that it would produce in "load" format, produced samples in that format, and then received no objection from plaintiffs until most of the production had been completed.  ECF Nos. 272-1 at 4, ECF 277 at 7.

D. Standards Governing Discovery

The scope of discovery is broad.  The parties may obtain discovery as to "any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case …."  Fed. R. Civ. P. ("Rule") 26(b)(1).  "Information within this scope of discovery need not be admissible in evidence to be discoverable."  Id.

As noted above, regarding electronically stored information ("ESI"), the Rules provide that the requester of such information "may specify the form or forms in which electronically stored information is to be produced."  Rule 34(b)(1)(C).  Although the requesting party is entitled to specify the format, the responding party is entitled to object to the requested format.  Rule 34(b)(2)(D); see Aguilar v. ICE Division of United States Dept. of Homeland Security, 255

F.R.D. 350, 356-57 (S.D.N.Y. 2008) ("[t]he responding party then must either produce ESI in the

form specified or object").  It is not enough simply to object, however.  The objecting party "must

state the form or forms it intends to use" in producing the ESI.  Rule 34(b)(2)(D).

In the absence of any timely objection to format, the objection is waived, and the

responding party must produce the requested ESI in the form requested (if no other valid

objections were made).  See Gaines v. Law Office of Patenaude & Felix, A.P.C., 2014 WL

3894345 at *1, 2014 U.S. Dist. LEXIS 113178 at *4 (S.D. Cal. 2014) ("Request for Production

No. 39 specifically requests the information be produced in one of these [specified] commercially

usable formats, or a similar format. … Therefore, it is not sufficient for Defendant to produce

only hard copies of the dial reports."); Dixon v. Experian Info. Sols., Inc., 2014 WL 2881589 at

*4, 2014 U.S. Dist. LEXIS 86268 at *9 (N.D. Ind. 2014) ("In its response to the Request for

Production, Experian did not address ESI or object to Dixon's ESI specifications. Thus, Experian

waived any objection to the ESI format requested by Dixon pursuant to Rule 34(b)(1)(C).");

Cenveo Corp. v. S. Graphic Sys., 2009 WL 4042898 at *2, 2009 U.S. Dist. LEXIS 108623 at *7

(D. Minn. 2009) (ordering production in the requested format where the responding party "failed

to object to producing the documents in their native format and failed to state the form or forms it

intended to use," and instead, "produced the documents in a .pdf form").

In general, the party seeking to compel discovery has the burden of establishing that its

request satisfies the relevancy requirements of Rule 26(b)(1).  See Bryant v. Ochoa, 2009 WL

1390794 at *1, 2009 U.S. Dist. LEXIS 42339 at *3 (S.D. Cal. 2009).  Once relevance has been

shown, the party opposing discovery then has the burden of showing that the discovery should be

prohibited, and the burden of clarifying, explaining or supporting its objections.  See Lofton v.

Verizon Wireless (VAW) LLC, 308 F.R.D. 276, 281 (N.D. Cal. 2015) ("[w]hile the party seeking

to compel discovery has the burden of establishing that its request satisfies relevancy

requirements, the party opposing discovery bears the burden of showing that discovery should not

be allowed, and of clarifying, explaining, and supporting its objections with competent

evidence").

////

1    E. <u>Analysis</u>

2        1. <u>Plaintiffs may specify the production format</u>

3        CDE argues that "[a] requesting party cannot demand production in one format versus

4    another just because one would allegedly ease a party's review process."  ECF 272-1 at 8-9.[8]

5    This argument runs directly contrary to the governing Rules, which expressly state just the

6    opposite: the requester "may specify the form or forms in which electronically stored information

7    is to be produced."  Fed. R. Civ. P. 34(b)(1)(C) ().  The Rule does not limit this authorization to

8    any specific set of circumstances, nor does it say that specifying the format is not available to

9    "ease" the review process.  Indeed, CDE's dismissive rejection of "ease" of review as a valid

10   reason for specifying the format is difficult to understand, since ease of review is precisely why

11   the requesting party would specify the format, and it is the very reason the requester is permitted

12   to do so.[9]

13       In support of its interpretation of Rule 34(b), CDE cites <u>Bridgepoint</u>, 305 F.R.D. 225.

14   However, rather than pointing to or identifying any language in <u>Bridgepoint</u> that supports its

15   argument, CDE offers only a general citation to the entire 28-page decision.  In fact, there is no

16   language in that decision that supports CDE's interpretation.  The only mention of "ease" of

17   review in <u>Bridgeport</u> occurs in a parenthetical to its citation of <u>Melian Labs Inc. v. Triology LLC</u>,

18   2014 WL 4386439 (N.D. Cal. Sept. 4, 2014).  Neither <u>Bridgeport</u> nor <u>Melian</u> supports CDE's

19   argument.

20       In <u>Bridgepoint</u>, plaintiffs wanted ESI produced in native format, while defendant wanted

21   to produce it in "TIFF" format.  <u>Bridgepoint</u>, 305 F.R.D. at 229.  However, "[t]he language

22   utilized in Plaintiffs' filings makes clear it did not make a specific request for Native production."

23   <u>Id.</u> at 245.  Here, plaintiffs specifically requested production in native format, as they are entitled

24   to do under the Rules.  In <u>Melian</u>, the court pointed out that the default format provisions of the

---

[8]  <u>See also</u>, ECF 277 at 18 (Opposition to Motion To Compel).
[9]  <u>See</u> Rule 34(b) advisory committee's notes to 2006 Amendments ("The amendment to Rule 34(b) permits the requesting party to designate the form or forms in which it wants electronically stored information produced. … *Specification of the desired form or forms may facilitate the orderly, efficient, and cost-effective discovery of electronically stored information*.") (emphasis added).

7

1   Rules did not apply if the parties had "otherwise stipulated" to a format.  <u>Melian</u>, 2014 WL

2   4386439 at *2 (citing Rule 34(b)(2)(E)).  In fact, the parties there had stipulated that "that ESI

3   may be produced in paper, PDF or TIFF."  <u>Id.</u>  It was in that context that the court stated that the

4   fact that "producing the documents in a searchable format would ease Triology's review does not

5   render Melian's production deficient."  <u>Id.</u>  In other words, ease of review is something for the

6   requesting party to think about when it makes its request, as plaintiffs did here.  Mere ease of

7   review, however, is not sufficient to override the requesting party's written stipulation that

8   production in a less convenient format would be sufficient.  Plaintiffs here from the beginning

9   requested ESI in native format with all metadata attached.  CDE's entirely unjustified reliance on

10  <u>Bridgepoint</u> (and implicitly, <u>Melian</u>), cannot change the *facts* of this case.

11                          2.  <u>CDE may not ignore plaintiffs' format request</u>

12          CDE argues that even though plaintiffs specifically requested production in native format

13  with metadata attached, CDE can ignore that request and produce it in some other format so long

14  as the production is in a "'usable form, e.g., electronically searchable and paired with essential

15  metadata.'"  ECF Nos. 272-1 at 6.  This argument also, is directly contrary to the text of the

16  discovery rules.  The Rules specify that the responding party may produce ESI "in a reasonably

17  usable form" *if* the request "does not specify a form for production."  Rule 34(b)(2)(E)(ii).  Here,

18  the request did specify a format, and therefore there was no basis for CDE to simply ignore it and

19  produce it in a format of CDE's own choosing.

20          CDE's cited cases do not support its interpretation of the discovery rules.  For example, in

21  <u>Aguilar</u>, plaintiffs' document request "did not specify the form in which they [plaintiffs] sought to

22  have electronically stored information ('ESI') produced, nor did it mention the production of

23  metadata."  <u>Aguilar</u>, 255 F.R.D. at 352.  Moreover, by the time the <u>Aguilar</u> plaintiffs first

24  mentioned the subject of metadata, defendants "had almost completed their document collection

25  efforts."  <u>Id.</u> at 353.  This sharply contrasts with the facts of this case.  Here, plaintiffs specified *at*

26  *the outset* that the ESI should be produced "in their native electronic format together with all

27  metadata and other information associated with each document in its native electronic format."

28  Sagy Exh. 1, ECF 274-1 at 17 ¶ 4 (instructions).  In addition, CDE does not claim to have

1    collected or produced any responsive documents prior to the time they received this request.[10]

2         CDE argues that it is entitled to ignore plaintiff's request because it produced the emails in

3    "load file" format, which, it claims, is "regarded as standard by Courts throughout the country, by

4    the Sedona Conference, and by this Court's Special Master, Winston Krone."  ECF No. 272-1

5    at 2-3 (footnotes omitted) and 3 nn.5-7.  This argument is entirely meritless.  While claiming that

6    "Courts throughout the country" have held that producing emails in "load file" format is

7    "standard," CDE has cited only <u>Aguilar</u>, 255 F.R.D. at 353, which says no such thing.  Even if

8    <u>Aguilar</u> did contain this holding, that one court cannot honestly be described as "Courts

9    throughout the country."

10        The Sedona Conference says no such thing either.  The cited materials only note that "[i]n

11   an effort to replicate the usefulness of native files while retaining the advantages of static

12   productions, image format productions are typically *accompanied* by 'load files ....'"  Comment

13   12.b, *The Sedona Principles: (Second Edition) Best Practices Recommendations & Principles for*

14   *Addressing Electronic Document Production - A Project of The Sedona Conference® Working*

15   *Group on Electronic Document Retention & Production (WG1) (*June 2007) (emphasis added).[11]

16   The materials do not state that load file format itself is standard or sufficient to ignore plaintiff's

17   requests.

18        Finally, the court rejects CDE's attempt to drag the Special Master into this dispute.  CDE

19   argues, apparently based solely upon counsel's recollection of what she claims was said in an

20   April 7, 2016 *ex parte* phone call with the Special Master, that the Special Master "approved" the

21   use of load file format despite plaintiff's request for the emails in native format.  <u>See</u> ECF

22   No. 272-2 at 2 ¶ 9.  This dubious claim, uncorroborated by any follow-up writing to confirm such

23   an important point – and to ensure that what counsel says she heard was not the result of

24   [10] <u>See also</u>, <u>Nat'l Jewish Health v. WebMD Health Servs. Grp., Inc.</u>, 305 F.R.D. 247, 253 (D.
     Colo. 2014) (Special Master's assertion that "Rule 34(b)(2)(E)(ii) trumps specific instructions in

25   discovery requests" is dicta, where "NJH ... specifically requested that WebMD produce emails
     in MSG format," and "WebMD complied with that request and produced email in MSG format");

26   <u>In re Payment Card Interchange Fee & Merchant Discount Antitrust Litigation</u>, 2007 WL 121426,
     2007 U.S. Dist. LEXIS 2650 (E.D.N.Y. 2007) (defendants did not specifically request metadata,

27   so court reasoned that plaintiffs could produce it in a reasonably usable form).
     [11]  <u>https://thesedonaconference.org/publication/The%2520Sedona%2520Principles</u> (available for

28   download on that page) (last visited by the court on January 31, 2017).

1    confusion or wishful thinking on her part – is irrelevant in any event, and indeed betrays CDE's

2    misunderstanding of the role of the Special Master.  The Special Master in this case is a technical

3    consultant, not a judge who could "approve" or disapprove of discovery production formats.  The

4    court therefore need not examine the credibility of CDE's claim that the "load file" format was

5    "approved" by the Special Master.  The technical feasibility or advisability of producing in this

6    format – a technical matter on which the Special Master may opine – is not determinative of

7    CDE's *legal* obligation to either produce in the format requested by plaintiffs, or to timely object

8    to that format.

9                            3.  CDE failed to object

10   CDE claims to have objected to the format of the requested ESI production on October 10,

11   2013, six months after the document requests were served.  Such objection would have been

12   untimely.  See Fed. R. Civ. P. 34(b)(2)(A) (responses are due 30 days from document request, or

13   30 days from the Rule 26(f) conference).  Apart from the timeliness issue, however, CDE's claim

14   is not true.  The October 10, 2013 document CDE relies upon was a transmittal letter of a

15   proposed protective order, not a response to a discovery request.  Substantively, the document

16   only "observe[d]" that "the question whether to produce metadata generally involves a balancing

17   test …."  No objection is created from the mere fact that a document transmitting a proposed

18   protective order *mentions* discovery issues and acknowledges that there is a "question" about

19   "whether to produce."[12]

20   CDE finally made an objection, of sorts, to producing ESI in the format requested by

21   ────────────────
     [12]  Apart from the fact that there is no objection stated in the October 10, 2013 letter, CDE's own
22   subsequent conduct led plaintiffs to a reasonable belief that ESI would be produced in native
     format with all metadata attached.  On March 4, 2014, CDE's counsel wrote to plaintiffs' counsel
23   to advise her that CDE is working with its vendor to ensure that requested electronic documents
     can be produced "in an organized manner."  Sagy Exh. 3, ECF 274-1 at 67.  The letter goes on to
24   assure plaintiffs' counsel that that effort "will not impede my client's ability to produce the
     documents with metadata intact and in their native format."  Id.  The following month, on April
25   30, 2014, the parties agreed, in writing, that "[a]ll documents will be produced with all metadata,
     if it exists, on CD-ROM disks, through a cloud service, or through other mutually agreeable
26   methods."  ECF No. 58 at 16 ¶ 14.5(a).  This agreement was "So Ordered" by the court.  See ECF
     No. 60 at 16 ¶ 14.5(a).  CDE argues now that the letter does not mean what it says and that the
27   stipulated order "did not order a specific format of production."  ECF No. 277 at 9, 15.  Even if
     the court were to accept CDE's strained interpretations of these documents, plaintiffs would be
28   forgiven for believing that CDE was agreeing to produce ESI in native format with all metadata
     attached.

1    plaintiffs, in an August 26, 2016 letter, more than three years after the document request was

2    served.  See Sagy Exh. 8, ECF 274-1 at 89-90.  While the letter does not even mention metadata,

3    the court construes it to be an objection to plaintiffs' request for production of ESI in native

4    format with all metadata attached.  Also, rather than proposing an alternative format to produce

5    ESI, the letter simply declares that CDE has already produced ESI in "load file" format, and

6    asserts that that is good enough.  Id. at 89.

7         The August 26, 2016 "objection" is therefore untimely and separately, not a valid

8    objection under Rule 34(b)(2)(D).

9              4.  Waiver

10        Plaintiffs argue that CDE has waived any objection to the format of ESI production.

11   Normally, defendant's untimely, invalid, piecemeal[13] objections, would be waived.  Richmark

12   Corp. v. Timber Falling Consultants, 959 F.2d 1468, 1473 (9th Cir.) ("[i]t is well established that

13   a failure to object to discovery requests within the time required constitutes a waiver of any

14   objection"), cert. dismissed, 506 U.S. 948 (1992); Cf. Puerto Rico Medical Emergency Group,

15   Inc. v. Iglesia Episcopal Puertorriqueña, ___ F.R.D. ___, 2016 WL 4004576 at *3, 2016 U.S.

16   Dist. LEXIS 99391 at *8 (D.P.R. 2016) ("In their untimely response, HESL, SGE, and SSE did

17   not object to the Excel file format. … This is enough to waive all future objections.").

18        In this case, however, a finding of outright waiver based *solely* upon timeliness of the

19   objection is not warranted.  On November 18, 2015, plaintiffs filed a Motion To Compel.  ECF

20   No. 129 (motion), 144 (Joint Statement).  Although plaintiffs noted that CDE had not produced

21   ESI in native format, they did not argue that CDE had waived any objections to format.  To the

22   contrary, plaintiffs attached a letter their counsel had sent to CDE's counsel, in which plaintiffs'

23   counsel stated that in negotiations over the production, "Plaintiffs agreed to waive native format

24

_____

25   [13]  CDE initially objected to the production of nearly any materials, on May 17, 2013, when it
     filed its initial objections.  See Sagy Exh. 2, ECF 274 1 at 33 64.  These were boilerplate
26   objections, and contained no objection to plaintiffs' request that ESI be produced in native format
     with all metadata attached.  See id.  CDE's next claimed objection was in the October 10, 2013
27   transmittal letter.  CDE next claimed objection was in its August 26, 2016 letter.  Even if each of
     these were valid objections (and in fact, not a single one of them contains a valid objection to
28   format under Rule 34(b)), CDE has engaged in an improper pattern of piecemeal objections over
     the course of years.

1   for the databases," and:

2   > Plaintiffs agreed to accept searchable pdfs for image files, text files
    > and CSV files for all materials produced. *Plaintiffs waived native*
3   > *format for the actual emails*, but asked that all attachments to
    > emails and all other non-email documents be produced in their
4   > native format (e.g. Word, WordPerfect, Excel, PowerPoint, etc.)

5   > All materials must be produced in a searchable form and have their
    > metadata intact.
6
    ECF No. 144-3 at 42, 43 (emphasis added).[14]  The court therefore will examine other factors, in
7
    addition to waiver, to determine this motion.
8
    ### 5. Burdensomeness & relevance
9
    CDE argues that it is unduly burdensome to produce ESI in native format, and that
10
    metadata is not relevant.  See ECF No. 272-1 at 6-8.
11
    ### i. Burdensomeness
12
    CDE argues that it would be burdensome to require it to "reproduce" ESI in native format.
13
    See ECF No. 277 at 18-19.  CDE complains that it has already produced "29,000 documents,"
14
    and it would be an undue burden for it to produce it again, in native format.  Id. at 18.
15
    The court rejects this argument because this is a problem of CDE's own making.  CDE
16
    created the problem it now complains about by engaging in an ESI production in a format of *its*
17
    choosing – the "load file format" – rather than the native format, with all metadata attached, as
18
    plaintiffs had requested.  Had CDE complied with the Rules governing ESI discovery, it would
19
    have produced the ESI in the requested format, thus avoiding the need to reproduce it now.  In the
20
    alternative, still following the Rules, CDE would have timely objected to the format, and
21
    *proposed* to produce the ESI in its own chosen format.  That would have allowed the parties to
22

23   ---
    [14]  Despite this concession made during negotiations, the court does not find that plaintiffs have
24   thereby waived their right to seek production of ESI in native format with all metadata attached.
    To the contrary, this concession appears to have been a "provisional" one made for negation
25   purposes only.  At all other times, plaintiffs have consistently insisted upon native format, with
    metadata attached, and complained about CDE's failure to produce in that format.  See Sagy
26   Exh. 1, ECF 274-1 at 17 (April 16, 2013 document request); Joint Statement, ECF No. 144 at 55
    (January 6, 2016); Sagy Exh. 4, ECF 274-1 at 71 (June 2, 2016 Sagy letter), Exh. 5, ECF 274-1
27   at 74 (July 20, 2016 Sagy letter), Exh. 7, ECF 274-1 at 79 (August 22, 2016 Sagy letter,
    complaining that email attachments are not in their "original" formats), Exh. 9, ECF 274-1 at 96
    (September 9, 2016 Sagy letter), Exh. 11, ECF 274-1 at 126 (September 21, 2016 Sagy letter),
28   Exh. 13 & 14, 274-1 at 138 (October 10, 2016 Sagy email).

1    meet and confer on what format would be used, and what metadata would be produced,

2    preferably without a court motion.  Even if the matter could not be worked out however, the

3    parties could have brought their discovery motions regarding format years ago, *before* CDE

4    produced ESI in the wrong format.  Since CDE chose to ignore the Rules, and chose to ignore

5    plaintiff's request that ESI be produced in native format, the court will not now hear its complaint

6    that it should not be made to reproduce the ESI in the requested format.

7         CDE also argues, in the broadest of generalities, that production "in multiple formats" is

8    unduly burdensome because of the "sheer volume of documents."  ECF No. 277 at 19.  However,

9    CDE has already agreed to produce some ESI in multiple formats, and claims to have already

10   done so.  See ECF No. 277 at 15 (referring to CDE's production of "native excel files, audio files,

11   and video files").  CDE's production of documents in multiple formats, apparently without

12   objection, undermines its overly-general argument that producing documents in multiple formats

13   is unduly burdensome.

14                          ii.  Relevance of metadata

15        It is not necessary to address the "relevance" of the metadata once the court has

16   determined that CDE should produce ESI in native format.[15]  First, as CDE itself explains, ESI in

17   native format cannot be separated from its metadata:  "Metadata in native documents cannot be

18   redacted or withheld.  A native file production necessarily includes all metadata fields in every

19   document."  Declaration of Sean Cotulla (ECF No. 272-4) at 4 ¶ 13.

20        Second, the district judge presiding over this case has already ordered that as for emails,

21   they are to be produced with all metadata intact:  "In producing responsive emails, the Parties will

22   produce the emails without alteration of any kind; in particular, threads, attachments, and

23   ────────────────────────

24   [15] This is fortunate for plaintiffs, since they they have not explained exactly what metadata they
     are requesting (other than to say "all metadata"), nor why it is relevant to this lawsuit.  Plaintiffs
25   have identified some items of metadata that are plainly relevant, and CDE has never argued that it
     is not: author or modifier; and creation or modification date.  See ECF No. 274 at 14, 16.
26   Plaintiffs have never explained why the other items of metadata they seek – notes or comments,
     highlights, tracking changes, underlining, strike-throughs and unspecified "other data fields" – are
27   relevant.  See ECF No. 274 at 14.  Indeed it is not clear how plaintiffs could make this showing
     since it appears that they do not even know what metadata fields are contained in the ESI.  There
28   is no indication in plaintiffs' papers that they have ever sought this information through simple
     interrogatories or otherwise.

                                              13

1   metadata associated with the emails and attachments should not be modified, deleted, or altered in

2   any respect." ECF No. 60 at 17 ¶ 14.5(c).

3              6. Privilege

4        CDE argues that producing in native format would infringe on the deliberative process,

5   attorney-client privileges and the work product protection. ECF No. 272-1 at 9. This objection is

6   valid only to the degree CDE can establish the existence of the privilege, and it has produced a

7   valid privilege log. As discussed below, CDE has failed to do either.

8              II.  ADEQUACY OF PRIVILEGE LOGS

9        Plaintiffs seek to compel production of documents "improperly withheld under defective

10  privilege claims because Defendant's privilege logs, both as originally produced and repeatedly

11  amended, fail to provide the level of detail required by Rule 26(a)(5)(A) and by this Court's

12  August 29, 2016 Order." ECF No. 273 at 2. Plaintiffs argue that the privilege logs do not

13  provide enough information for it or the court to assess the assertion of privilege. To the

14  contrary, they argue, the "descriptions" of the withheld documents are at most, just conclusory

15  statements, that are essentially just the legal definition of the privilege or protection asserted.

16       CDE argues that Ninth Circuit law approves of the descriptions it has given. In addition,

17  defendant has now, belatedly, provided a declaration – in its opposition papers – describing

18  categorically what the withheld documents are, and why they are entitled to privilege. ECF No.

19  277 1 at 3 ¶¶ 9(a)-(c).

20       As discussed above, plaintiffs served their First Set of document requests on April 16,

21  2013. See Sagy Exh. 1, ECF 274-1 at 13-30. On May 17, 2013, Defendants objected on grounds

22  of privilege and attorney work product (among other grounds). See Sagy Exh. 2, ECF 274-1

23  at 33-64. However, CDE did not properly assert the privilege, nor provide a privilege log of any

24  kind, thus violating Fed. R. Civ. P. 26(b)(5)(A). See ECF No. 150 at 8 (order). The court

25  accordingly denied CDE's privilege claims without prejudice to their renewal in accordance with

26  the Rules. Id.

27  ////

28

1          A. The Privilege Logs

2          In June, July and August, 2016, CDE produced privilege logs for its email productions. In

3   plain violation of Rule 26(b)(5)(A), the logs failed to provide even the minimal information

4   plaintiffs and the court would need "to assess the claim" of privilege. For example, the logs did

5   not indicate whether either the sender or recipient was an attorney or a client. They did not

6   indicate what was the subject of the communication, and instead simply reprinted the subject line

7   of the email. Incredibly, the subject line itself was often redacted, making it impossible to know

8   what the email was about.[16] Indeed, the log seems to betray CDE's incorrect view that any email

9   from or to any lawyer was privileged (assuming either the sender or the recipient was a lawyer, a

10  fact not disclosed by the log), regardless of who else may have seen it, what it concerned, whether

11  it was intended to be confidential, and whether the privilege was waived.[17]  On August 29, 2016,

12  the court advised CDE that the privilege log was inadequate. ECF No. 232.

13         On October 13, 2016, CDE produced "revised" privilege logs. These logs also fail to

14  comply with Rule 26(b)(5)(A). For example, where they alleged attorney client privilege, they

15  again fail to indicate who (if anyone) is the lawyer on the email. The description of most emails

16  is so general (for example, "Draft decision/policy"), the plaintiffs and the court have no way of

17  assessing the claim of privilege. Indeed, many entries have even less information than the

18  original logs. For example, the descriptions in the "revised" July 2016 privilege log consist

19  entirely of *definitions* of attorney client materials, and only partial definitions at that:

20  "Communication made in confidence for the purpose of giving or obtaining legal advice."

21         B. Julia Jackson Declaration

22         On December 7, 2016, in a declaration opposing plaintiffs' motion to compel, CDE finally

---

[16]  In one instance, the only un-redacted piece of information about the subject of the email is "1."
In others, the only un-redacted subject information is "FW:"

[17]  "The fact that a person is a lawyer does not make all communications with that person
privileged. Because it impedes full and free discovery of the truth, the attorney-client privilege is
strictly construed. Wigmore on Evidence describes the several elements of the privilege this way:
(1) When legal advice of any kind is sought (2) from a professional legal adviser in his or her
capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by
the client, (6) are, at the client's instance, permanently protected (7) from disclosure by the client
or by the legal adviser (8) unless the protection be waived. The burden is on the party asserting
the  privilege to establish all the elements of the privilege."  United States v. Martin, 278 F.3d
988, 999-1000 (9th Cir. 2002) (citations and internal quotation marks omitted).

1    offered categorical descriptions of what was contained in the privileged documents.

2    See Jackson Decl., ECF No. 277-1 at 3 ¶ 9(a)-(c).  CDE, however, did not include or refer to

3    these categorical descriptions in the privilege logs, the revised privileged logs, or the cover letters

4    to those logs.  Instead, CDE forced plaintiffs to bring this motion, and only then – six months

5    after the first privilege log, and two months after the last one – did they provide these

6    descriptions.

7         C.  Analysis

8              1.  The privilege logs are inadequate

9         CDE argues that "a log which provides information on the subject matter of each

10    document exceeds the requirements for establishing the privilege."  ECF No. 277 at 23, citing In

11    re Grand Jury Investigation, 974 F.2d 1068, 1071 (9th Cir. 1992).  That is not correct.  In Grand

12    Jury Investigation, the party claiming privilege "submitted a privilege log and affidavits regarding

13    their confidential nature."  In re Grand Jury Investigation, 974 F.2d at 1071 (emphasis added).

14    The court upheld the assertion of privilege, stating that the "privilege log went beyond the Dole

15    standards to provide information on the subject matter of each document."  974 F.2d at 1071.

16    The court was referring to Dole v. Milonas, 889 F.2d 885, 888 n. 3, 890 (9th Cir.1989), a case

17    which upheld the assertion of privilege by means of a privilege log.

18         In Dole, the Secretary of Labor issued an administrative subpoena, accompanied by a

19    letter.  "That letter described the procedure to be followed with respect to any document as to

20    which the attorney-client privilege was invoked."  Dole, 889 F.2d at 887 88.  The letter instructed

21    the recipient to provide a list of privileged documents, and set forth exactly what must be

22    included on that list.  Id. at 888 n.3.  "Subject matter" of the communication was not included on

23    that list.  Id.  When asking for the "nature" of the document, it asked only for "i.e. letter,

24    memorandum."  Id.  This was not a "standard" imposed by the court, it was simply the

25    information requested by the Secretary.

26         Moreover, both Grand Jury Investigation and Dole were decided before the 1993

27    amendments to the Federal Rules of Civil Procedure.  Those amendments added Rule 26(b)(5),

28    which for the first time expressly called for the use of a privilege log that described "the nature of

16

the documents, communications, or things not produced or disclosed in a manner that, without

revealing information itself privileged or protected, *will enable other parties to assess the*

*applicability of the privilege or protection*." Rule 26(b)(5) (emphasis added).

Indeed, after the 1993 amendments, the Ninth Circuit interpreted (or re-interpreted) Dole

as authorizing different methods of asserting privilege, "all of which involve conveying some

information about the *content* of the allegedly privileged material, which a boilerplate objection

does not do." Burlington Northern & Santa Fe Ry. Co. v. United States District Court for the

District of Montana, 408 F.3d 1142, 1148 (9th Cir.) (emphasis added), cert. denied, 546 U.S. 939

(2005). Burlington goes on to state that while the 1993 amendments do not specify exactly what

must be in a privilege log, "boilerplate objections … are insufficient to assert a privilege." Id. at

1149. Instead, in assessing the assertion of privilege (and whether it's been waived), the district

court is instructed to take into account several factors, including:

> the degree to which the objection or assertion of privilege enables
> the litigant seeking discovery and the court to evaluate whether
> each of the withheld documents is privileged (where providing
> particulars typically contained in a privilege log is presumptively
> sufficient and boilerplate objections are presumptively insufficient).

Id. at 1149 (emphasis added).[18]

CDE argues that "a general description that describes a document as a draft decision or

policy containing pre-decisional agency material is sufficient to establish the deliberative process

privilege …." ECF No. 277 at 23, citing Assembly of California v. United States Dep't of

Commerce, 968 F.2d 916, 920 (9th Cir. 1992). The cited case – which involves Exemption 5 of

the federal Freedom of Information Act ("FOIA"), 5 U.S.C. § 552(b)(5) – says no such thing.

Nowhere does the case state that "a general description is sufficient," nor does it state what "a

general description" would entail. To the degree the decision opined at all on the sufficiency of

the description, it says, "[w]e give the government the benefit of the doubt and *assume* for

purposes of our review that the tapes are 'inter-agency or intra-agency memorandums' within the

---

[18]  Even reading Grand Jury Investigation as identifying a standard in Dole, the identification of
such a standard was dicta. In Grand Jury Investigation, the privilege log and affidavit did provide
information about the subject matters of the withheld communications. In re Grand Jury
Investigation, 974 F.2d at 1071. Since the privilege log therefore met a higher standard, it was
not necessary to the decision for the court to assert that a lower standard was set forth in Dole.

1    meaning of Exemption 5 [of FOIA].'" <u>Assembly</u>, 968 F.2d at 920 (emphasis added).

2                    2.  <u>The Jackson Declaration does not rescue the defective privilege logs</u>

3            The Jackson Declaration, meanwhile, does not allow the court to resolve the matter in

4    CDE's favor, even apart from its untimeliness.  The privilege logs are still defective, even when

5    read in conjunction with the Declaration.  Most glaringly, rather than doing a proper document-

6    by-document privilege log, or a proper categorical privilege log, CDE instead combined the two

7    in a way that prevents plaintiffs and the court from assessing the assertions of privilege.  Thus,

8    there is typically no way to tell which descriptions in the Declaration apply to which documents

9    in the privilege logs, and sometimes the descriptions appear to be contradictory.

10           For example, PRIV5850 (from the October Privilege Log), asserts "Attorney Client

11   Communication."  There is no way for plaintiffs or the court to assess this assertion of privilege.

12   The only description given is "Draft decision/policy."  The "description" does not clarify whether

13   this a draft decision, or a draft policy, or both, nor what decision or policy is involved.  Looking

14   to the Declaration for help, there is nothing there that describes a communication regarding a

15   draft policy as being protected by the attorney client privilege.  There is simply no way to assess

16   the claim that this document is protected by the attorney client privilege.

17           Even if the Declaration did include "draft policies" in its categorical descriptions, the

18   Declaration is simply the wrong place for it.  CDE may not force plaintiffs and this court to

19   wander through entirely different documents in a mad effort to match up documents listed in a

20   privilege log, privilege categories set out in a separate declaration, and a set of attorneys listed in

21   yet another document.  The privilege log itself must provide all the information the plaintiffs and

22   this court need to assess the assertion of privilege.[19]

23           The overly general descriptions, the failure to link the categorical descriptions with

24   individual documents, and the failure to identify who are attorneys or decision-makers, also doom

25   CDE's assertion of deliberative process privilege[20] and work product protection.

26   [19]  The court accordingly rejects CDE's assertion that plaintiffs and the court must engage in
     some sort of "cross-referencing" process, apparently involving several different revisions of the
27   privilege logs, to understand what privilege is being asserted.  <u>See</u> ECF No. 277 at 27-28 n.9.
     [20]  The deliberative process privilege covers "documents reflecting advisory opinions,
28   recommendations and deliberations comprising part of a process by which governmental

1    D. Resolution

2         At some point, CDE's failure to produce timely, legally sufficient privilege logs, will

3    result in a waiver of the asserted privileges and protections.  See Burlington, 408 F.3d at 1149

4    ("Here, the district court found a waiver where the [privilege] log not only was not filed during

5    the Rule 34 time limit, but was filed *five months* later. … *The district court did not err in*

6    *ordering Burlington* to produce documents as to which it had untimely asserted a privilege.")

7    (emphases in text).  Plaintiffs can be excused for believing that CDE passed that point long ago.

8         However, the court is reluctant to sanction CDE by ordering the production of possibly

9    thousands of documents containing confidential attorney client, work product and deliberative

10   process information.  Accordingly, the court will not declare a waiver at this point.  Instead, the

11   court will grant the motion to produce the documents in CDE's privilege logs, and give CDE 30

12   days to either produce the documents or produce proper privilege logs.  This will be CDE's final

13   chance to produce adequate privilege logs, and any assertions of privilege that are incapable of

14   determination will be overruled once and for all.

15                               III.  ATTORNEYS' FEES

16        As discussed above, plaintiffs' motion to compel is meritorious.  They are entitled to

17   production of ESI in the format they requested, with all metadata, and CDE has again failed to

18   provide a proper privilege log.  Plaintiffs are therefore entitled to their "reasonable expenses"

19   incurred in making the motion to compel, "including attorney's fees."  Fed. R. Civ.

20   P. 37(a)(5)(A); see Balla v. Idaho, 677 F.3d 910, 920 (9th Cir. 2012) ("Rule 37(a)(5)(A) requires

21   the court to award attorneys fees in most circumstances where 'the disclosure or requested

22   discovery is provided after the motion was filed'").

23        Plaintiffs request that their attorneys' fees be awarded at San Francisco rates.  See ECF

24   No. 274-1 at 11 ¶ 43 (incorporating ECF No. 206-2, 206-8, explaining the use of San Francisco

25   rates).  However, the undersigned has already determined that local, Sacramento rates are

26   _____

27   decisions and policies are formulated."  Dep't of Interior v. Klamath Water Users Protective
     Ass'n, 532 U.S. 1, 8-9 (2001) (internal quotations omitted).  Accordingly, the privilege log must
28   show that the document sought to be withheld is both "predecisional" and "deliberative in
     nature."  Jeff D. v. Otter, 643 F.3d 278, 289 (9th Cir. 2011).

1  appropriate for attorneys' fees in this case.  See ECF No. 229 at 21-24.  Plaintiffs have offered no

2  explanation for why the undersigned should not use Sacramento rates here.  Accordingly,

3  plaintiffs' request for attorneys' fees will be denied with leave to renew using Sacramento rates.[21]

4                                    IV.  CONCLUSION

5          For the reasons set forth above, IT IS HEREBY ORDERED THAT:

6  1.     Plaintiffs' motion to compel (ECF No. 273) is GRANTED, as follows:

7          a.    Within 30 days, CDE shall produce all ESI in native format with all metadata

8                attached.  Any ESI that has already been produced in another format shall be

9                reproduced in native format with all metadata attached, within 30 days; and

10         b.    Within 30 days, CDE shall produce (i) all documents withheld under its privilege

11               logs, or (ii) legally sufficient privilege logs to cover those documents;

12  2.    Plaintiffs' request for attorneys' fees (ECF No. 273) is DENIED without prejudice to its

13         renewal, within 30 days, using Sacramento rates.

14  3.    Defendants' motion for a protective order (ECF No. 272) is DENIED, as follows:

15         a.    Defendant's request for a protective order is DENIED; and

16         b.    Defendant's request for attorneys' fees is DENIED.

17  DATED: February 1, 2017

18                                   _____
                                     ALLISON CLAIRE
19                                   UNITED STATES MAGISTRATE JUDGE

20

21

22

23

24

25

26

_____

27  [21]  Plaintiffs have not requested any sanctions other than attorneys' fees, and have not provided
     any legal justification for awarding them fees at San Francisco rates as a sanction, and
28  accordingly no such sanctions will be considered at this time.

                                          20