UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

MORGAN HILL CONCERNED
PARENTS ASSOCIATION, et al.,

Plaintiffs,

v.

CALIFORNIA DEPARTMENT OF
EDUCATION,

Defendant.

No.  2:11-cv-03471-KJM-AC

ORDER

Two associations of concerned parents allege in this lawsuit that the California Department of Education (CDE) does not ensure children with disabilities receive a free appropriate public education.  They claim this failure violates federal and state law and ask the court to enjoin CDE from any future violations.  CDE disagrees and moves for judgment on the pleadings under Federal Rule of Civil Procedure 12(c).  Mot. J. on the Pleadings (MJOP), ECF No. 172.  CDE's current motion parallels its previous motion to dismiss under Rule 12(b)(6), which the court denied in March 2013.  Order March 29, 2013, ECF No. 25.  CDE explains its renewed challenge by citing two intervening decisions: *Armstrong v. Exceptional Child Center, Inc.*, 135 S. Ct. 1378 (2015), and *M.M. v. Lafayette School District*, 767 F.3d 842 (9th Cir. 2014).  It also raises a new defense under the Tenth Amendment.

Plaintiffs separately move for sanctions.  Mot. Sanctions, ECF No. 206.  The magistrate judge declined to resolve this question and referred plaintiffs' motion to this court because the motion is based on CDE's conduct before this court.  Order August 17, 2016, ECF No. 229.  This court accepts the referral.

The court held a hearing on October 7, 2016, to address both motions.  Rony Sagy appeared for the plaintiffs; Grant Lien appeared for CDE.  As explained below, the court DENIES CDE's motion for judgment on the pleadings and DENIES plaintiffs' motion for sanctions.

Below, the court addresses each motion in turn.

I.      JUDGMENT ON THE PLEADINGS

A.      Background

1.      The IDEA

Both CDE's motion and plaintiffs' complaint concern primarily the federal Individuals with Disabilities Education Act (IDEA).  The IDEA has its roots in the more awkwardly named Education for All Handicapped Act, originally passed in 1970.  *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 51–52 (2005); *Timothy O. v. Paso Robles Unified Sch. Dist.*, 822 F.3d 1105, 1109 (9th Cir. 2016).  At that time, many public schools had neglected the needs of American schoolchildren with disabilities.  *Schaffer*, 546 U.S. at 52.  Millions of children either were excluded entirely or left to suffer in class with undiagnosed and unaddressed disabilities.  *Timothy*, 822 F.3d at 1110.  Congress intended the IDEA to reverse this history.  *Schaffer*, 546 U.S. at 52.

Congress passed the IDEA exercising its power under the Spending Clause.[1] *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 295 (2006).  States receive federal funds on the condition they comply with Congress's goals and procedures when providing an education to children with disabilities.  *Id.*; *Timothy*, 822 F.3d at 1110.  One of these goals is

---

[1] The court notes plaintiffs' assertion that IDEA also was enacted under the Fourteenth Amendment.  *See* Pls.' Suppl. Br., ECF No. 261 (citing *Arlington*, 548 U.S. 291, 305 (2006); *Counsel v. Dow*, 849 F. 2d 731, 735–37, 739 (2d Cir. 1988)).  Because the court finds other reasons for denying CDE's motion, the court does not reach the issue here.

2

the provision of a free appropriate public education, known as a "FAPE," to all children who have disabilities and are between the ages of three and twenty-one. 20 U.S.C. § 1412(a)(1)(A); *Timothy*, 822 F.3d at 1110. Other provisions require states to set scheduled goals for the education of children with disabilities, 20 U.S.C. § 1412(a)(2); to identify and evaluate students with disabilities, *id.* §§ 1412(a)(3), (a)(7); to develop individualized plans for each child's education, *id.* § 1412(a)(4); to avoid the separate education of children with disabilities, if possible, *id.* § 1412(a)(5); and to monitor local agencies' efforts, *see generally id.* § 1416.

Cooperation between parents and schools is at the IDEA's center. *Shaffer*, 546 U.S. at 53. Schools must work with the parents of each disabled child to create a program for the child's individualized education. 20 U.S.C. § 1414(a)–(c); *Schaffer*, 546 U.S. at 53. The IDEA allows schools flexibility in creating this program, but it guards parents' collaborative role by ensuring their access to information. *Timothy*, 822 F.3d at 1112. For example, schools must thoroughly document the data used in evaluating students' disabilities and must allow parents to examine their children's records. *Id.* (citing 20 U.S.C. § 1414(b)(1) and (4) and 34 C.F.R. § 300.306(c)(1)).

The IDEA also prescribes methods for resolving disputes. *Fairfield-Suisun Unified Sch. Dist. v. Cal. Dep't of Educ.*, 780 F.3d 968, 969 (9th Cir. 2015). As a condition of receiving federal funds, states must provide "an opportunity for any party to present a complaint . . . with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child . . . ." 20 U.S.C. § 1415(b)(6)(A). If a state receives a complaint under this provision, the parents or the school district must be allowed "an impartial due process hearing" before a state or local agency. *Id.* § 1415(f)(1)(A). In California, the Office of Administrative Hearings (OAH) conducts these hearings. *Fairfield–Suisun*, 780 F.3d at 969; *Lafayette*, 681 F.3d at 1085 & n.3. The OAH is a state agency within the Department of General Services and is independent of the CDE. *Fairfield–Suisun*, 780 F.3d at 969; *Lafayette*, 681 F.3d at 1085 & n.3. Anyone aggrieved by the result of an impartial hearing may bring a civil action in a state court or in a federal district court, regardless of the amount in controversy. 20 U.S.C. § 1415(i)(2)(A).

3

States that receive IDEA funding must adopt a second procedure to address complaints, as detailed in 34 C.F.R. §§ 300.151–.153. *See also Fairfield–Suisun*, 780 F.3d at 969. Under federal regulations, a state educational agency must accept complaints submitted under this second procedure, review all relevant information, and render an independent written determination of the complaint's merits. 34 C.F.R. § 300.152(a). The IDEA and its regulations do not specify whether a party who is dissatisfied with the state's decision in this respect may obtain further review in federal court. *Fairfield–Suisun*, 780 F.3d at 969. The Ninth Circuit recently reaffirmed that a local agency cannot sue the state in federal court if it is dissatisfied with the state's decision or procedure. *Id.* at 970–71 (citing *Lake Wash. Sch. Dist. No. 414 v. Office of Superintendent of Pub. Instruction*, 634 F.3d 1065, 1067–68 (9th Cir. 2011)). By contrast, the Circuit has not decided whether parents can sue the state in this context. *See id.* It has concluded that parents may exhaust their administrative remedies, a separate prerequisite to review in federal court, by completing this second complaint proceeding. *See Christopher S. ex rel. Rita S. v. Stanislaus Cty. Office of Educ.*, 384 F.3d 1205, 1209–14 (9th Cir. 2004). The Circuit therefore has recognized a parent's private right of action implicitly, as this court previously summarized. *See* Order Mar. 29, 2013 (2013 Order) 10, ECF No. 25. California receives federal funds under the IDEA. *Id.* at 2.

### 2. Plaintiffs' Claims

The plaintiffs in this case, Morgan Hill Concerned Parents Association and Concerned Parents Association, are unincorporated associations of parents of children with disabilities in California public schools. First Am. Compl. ¶ 4, ECF No. 6. They claim California systemically denies children with disabilities a free appropriate public education and so falls short of its obligations under the IDEA. They filed a complaint in this court in 2011 and an amended complaint a few months later. 2013 Order 3. Their amended complaint alleges three broad categories of systemic IDEA violations, which are summarized as follows:

> (1) The CDE monitors local school districts' efforts to comply with the IDEA only superficially. It does not ask for meaningful data or verify the accuracy of data it receives. It analyzes data selectively and turns a blind eye to negative trends. First Am. Compl. 13–28.

4

(2) The CDE does not truly investigate the complaints it receives. In its investigations, it relies on unverified reports prepared by allegedly deficient school districts. *Id.* at 28–31.

(3) The CDE takes no action to meaningfully enforce school districts' obligations under the IDEA. It requires only that school districts adopt policies, not implement those policies, and it is satisfied with shallow promises of future effort. It does not verify compliance, and when it does, it does so by sampling student data after advanced warning. School districts can therefore sanitize their records. *Id.* at 31–32.

Plaintiffs assert six claims on the basis of these allegations. Their first four claims allege violations of the IDEA, federal regulations adopted under the IDEA, and accompanying sections of the California Education Code. *See id.* ¶¶ 82, 84, 86, 88. These four claims are based on CDE's alleged failures to ensure school districts provide a free appropriate public education, to monitor local school districts, to investigate problems, and to enforce the law.

Plaintiffs' fifth claim asserts a violation of Section 504 of the Rehabilitation Act of 1973, which prohibits discrimination on the basis of a disability "under any program or activity receiving Federal financial assistance . . . ." 29 U.S.C. § 794(a). In regulations adopted under section 504, states must ensure students with disabilities are provided with a free appropriate public education, regardless of the nature or severity of their disability. *See* 34 C.F.R. § 104.33.

Plaintiffs' sixth claim asserts violations of the California Education Code, beginning with section 56000, and Title 5 of the California Code of Regulations, again based on CDE's alleged failure to provide students with a free appropriate public education.

3.     Procedural History

Approximately five years ago, in June 2012, CDE moved to dismiss this case under Federal Rule of Civil Procedure 12(b)(1) and (6). ECF No. 13. Among other arguments, CDE asserted Congress had not allowed private plaintiffs to enforce the IDEA as the plaintiffs here sought to do, *see* Mem. P. & A. Mot. Dismiss 5–6, ECF No. 13-1, and it argued in any event that the plaintiffs had not exhausted their administrative remedies, *see id.* at 16–17. The court disagreed on both points. 2013 Order 8–14. It found that the IDEA allows parents to pursue relief in federal court after filing a complaint under 20 U.S.C. § 1415(f). 2013 Order at 9–10

5

1   (citing, *inter alia*, *Beth V. v. Carroll*, 87 F.3d 80, 86 (3d Cir. 1996)).  Similarly, the court read

2   Ninth Circuit precedent to recognize a private right of action to challenge the results of a

3   complaint resolution proceeding under 34 C.F.R. §§ 300.151–.153.  2013 Order 10 (citing

4   *Christopher S.*, 384 F.3d at 1211).  The court also found the plaintiffs were not required to have

5   first sought relief in one of the two administrative proceedings summarized above.  *Id.* at 13–14.

6   That effort would have proven futile, and the alleged violations are so severe that, if they are true,

7   the IDEA's basic goals are under threat.  *Id.*  In these circumstances the Ninth Circuit allows an

8   exception to the ordinary rules of exhaustion.  *Id.* (citing, *inter alia*, *Hoeft v. Tucson Unified Sch.*

9   *Dist.*, 967 F.2d 1298, 1303–04 (9th Cir. 1992)).

10          After the court filed its order in March 2013, the case stalled in a miasma of

11   discovery conflicts.  The court ultimately appointed a special master to break the logjams and

12   facilitate the production of CDE's electronic records.  CDE's current motion was filed in April

13   2016, in the midst of a round of discovery disputes.  *See* Mot. J. on the Pleadings, ECF No. 172;

14   Mem. P. & A., ECF No. 172-1.  CDE argues, as before, that plaintiffs' complaint rests on IDEA

15   provisions for which Congress intended no private enforcement.  As noted, CDE relies primarily

16   on two appellate decisions issued in the years since the court's 2013 order: the Ninth Circuit's

17   opinion in *M.M. v. Lafayette School District*, 767 F.3d 842, and the U.S. Supreme Court's

18   opinion in *Armstrong v. Exceptional Child Center, Inc.*, 135 S. Ct. 1378.  CDE also argues

19   plaintiffs' Rehabilitation Act claim is barred by the Tenth Amendment.  It asks the court to

20   dismiss these federal claims and decline supplemental jurisdiction over the remaining claims

21   under California law.[2]  Plaintiffs opposed the motion, ECF No. 208, and CDE replied, ECF No.

22   224.

23          The court first reviews the legal standard that applies to a motion for judgment on

24   the pleadings, then turns to CDE's arguments.

25

26   _____

     [2] The CDE's briefing originally included a third argument: that the sixth claim, brought
27   under the Education Code, was barred by the Eleventh Amendment.  It withdrew from this
     position in its reply brief.  *See* Am. Reply 2; *see also* Hr'g Transcript October 7, 2016 at 16–17,
28   ECF No. 259.   The court therefore does not address the Eleventh Amendment in this order.

### B. Legal Standard

"After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). A motion under this Rule may argue the complaint does not state a claim on which relief can be granted or that the court lacks jurisdiction. *See* Fed. R. Civ. P. 12(h)(2)(B), (h)(3). The same legal standard applies to motions under Rule 12(b)(6) and 12(c), and much of the process described by the Supreme Court in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), applies to Rule 12(c) motions; the Ninth Circuit describes the legal standards under these motions as "substantially identical." *Pit River Tribe v. Bureau of Land Mgmt.*, 793 F.3d 1147, 1155 (9th Cir. 2015); *Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1054 n.4 (9th Cir. 2011). In short, the court must consider whether the plaintiffs' factual allegations state a plausible claim for relief when allowed the benefit of reasonable inferences. *Cafasso*, 637 F.3d at 1054; *Fang Lin Ai v. United States*, 809 F.3d 503, 506 (9th Cir. 2015). The motion can be granted only if CDE shows that despite the plaintiffs' allegations, CDE is entitled to judgment as a matter of law. *See United States v. Teng Jiao Zhou*, 815 F.3d 639, 642 (9th Cir. 2016).[3]

### C. Discussion

#### 1. *Lafayette*—Private Rights of Action and 20 U.S.C. § 1415

A plaintiff in federal court must establish both that the court has jurisdiction to hear her complaint and that she has a right to sue the defendant identified—a "right of action." *See Fairfield–Suisun*, 780 F.3d at 970. When, as in this case, a plaintiff's claims rest on alleged violations of a statute, the case can go forward only if that statute contemplates her claims. *See Lake Wash.*, 634 F.3d at 1067.

A statute can confer a right of action expressly or by implication. *See Fairfield–Suisun*, 780 F.3d at 971. The IDEA defines at least one right of action expressly. As summarized

---

[3] The court does not separately consider whether CDE's motion is better understood as a motion for reconsideration, as the plaintiffs suggest. If that is the case, the difference is not meaningful. CDE could succeed on the basis of a change in binding precedent or clear legal error. *See, e.g.*, *Sony Computer Entm't Am., Inc. v. Filipiak*, 406 F. Supp. 2d 1068, 1076 (N.D. Cal. 2005); *Abada v. Charles Schwab & Co.*, 127 F. Supp. 2d 1101, 1102–03 (S.D. Cal. 2000).

above, under 20 U.S.C. § 1415(b)(6), states must provide "an opportunity for any party to present a complaint . . . with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child . . . ." A state or local agency must then conduct "an impartial due process hearing," *id.* § 1415(f)(1)(A), and after this hearing,

> Any party aggrieved by the findings and decision . . . shall have the right to bring a civil action with respect to the complaint presented pursuant to this section, which action may be brought . . . in a district court of the United States, without regard to the amount in controversy,

*Id.* § 1415(i)(2)(A).

This court previously interpreted these provisions to allow associations of parents to sue a state agency for alleged systemic failures under 20 U.S.C. §§ 1412, 1415 and 1416. *See* 2013 Order 8–12. The court's decision was informed by a 1996 opinion of the Third Circuit Court of Appeals, *Beth V. v. Carroll*, *supra*, 87 F.3d 80. A few details about that case will help explain CDE's current arguments and the court's reasoning.

The plaintiffs in *Beth V.* were two children with learning disabilities, their parents, and a non-profit advocacy organization. *Id.* at 81. They alleged that the Pennsylvania Department of Education's systemic unresponsiveness to complaints deprived them and many other children of a means of challenging failures in local schools. *Id.* at 83. They asked the district court to declare the state's noncompliance, to order the state into action, and to award damages for the private educational services parents had obtained to substitute for the education Pennsylvania had deprived their children. *Id.* at 83–84. The Office of Special Education Enforcement in the United States Department of Education had identified similar problems and had recently ordered the state to develop a plan for fuller compliance. *Id.* at 84.

On its own motion, the skeptical district court asked the parties whether the IDEA conferred on private plaintiffs a right of action against the Pennsylvania Department of Education. *Id.* at 84–85. After receiving responses, the court granted summary judgment to the state, finding the plaintiffs had no right of action under the IDEA. *Id.* at 85. The court could find no provision in the IDEA expressly creating a right of action and declined to infer one. *See* 876 F.

8

Supp. 1415, 1426–32 (D. Pa. 1995), *rev'd*, 87 F.3d 80. The court explained that the plaintiffs'
requested remedy would entangle the court in "the quintessentially executive tasks of recruiting
and training personnel, of devising specific methods for complete and timely resolution of
complaints, and of monitoring the effectiveness of these decisions bi-annually for the next five
years." *Id.* at 1430.

A Third Circuit panel reversed in a strongly worded opinion. It held that the IDEA
expressly created a private right of action in 20 U.S.C. § 1415, whose language "plainly
encompassed" the plaintiffs' claims. 87 F.3d at 86. The appellate panel listed six reasons for its
decision:

> (1) The plaintiffs' complaints directly implicated "the provision of a
> free appropriate public education" to children, as required by
> § 1415(b)(6), which underlies the express private right that
> section creates. 87 F.3d at 86.
>
> (2) Section 1415(b)(6) also refers to "any matter relating to the
> identification, evaluation, or educational placement" of a child,
> extending that subsection's reach beyond even a narrow reading
> of the phrase "provision of a free appropriate public education."
> 87 F.3d at 86.
>
> (3) The procedural safeguards in § 1415 "lie at the core" of that
> section and Congress's decision to allow private lawsuits. 87
> F.3d at 86–87 (collecting authority on this point).
>
> (4) The Pennsylvania Department of Education could not succeed
> by arguing the plaintiffs' claims involved only the adequacy of
> regulation writ large. *Id.* at 87. This was a back-door challenge
> to standing, and the plaintiffs' specific complaints showed they
> had standing. *Id.*
>
> (5) The adoption of a complaint resolution procedure showed the
> U.S. Department of Education had intended to allow parents to
> bring problems to the state's attention. *Id.* If parents
> encountered "pervasive and entrenched obstacles to securing an
> adequate education," but could not ask a judge to intervene, this
> purpose would be thwarted. *Id.*
>
> (6) States have a broad obligation under the IDEA to assure that its
> requirements are carried out, including the IDEA's complaint
> procedures. *Id.* at 87–88.

Finally, although the Third Circuit did not reach the question, it suggested the
plaintiffs would not be required to have first secured a due process hearing before suing the state
in federal court. *See id.* 88–89. Rather, the claims the plaintiffs advanced in court concerned the

9

administrative process itself, which suggested an administrative appeal would have been useless. *Id.* (citing *Komninos v. Upper Saddle River Bd. of Educ.*, 13 F.3d 775, 778 (3d Cir. 1994) (circuit precedent did not require plaintiffs to exhaust futile or inadequate remedies, to address purely legal questions in an administrative procedure, or to otherwise exhaust administrative remedies when doing so would work severe or irreparable harm).

This court previously found the Third Circuit's reasoning persuasive and denied CDE's previous motion to dismiss. 2013 Order 10–12. Several district courts have reached similar decisions over the years. *See, e.g.*, *N.J. Prot. & Advocacy, Inc. v. N.J. Dep't of Educ.*, 563 F. Supp. 2d 474, 489–90 (D.N.J. 2008) (citing *Beth V.* and holding that plaintiff advocacy groups, who alleged systemic noncompliance, could enforce IDEA's monitoring requirements); *Corey H. v. Bd. of Educ. of City of Chicago*, 995 F. Supp. 900, 916–17 (N.D. Ill. 1998) (finding individual plaintiffs had right to enforce IDEA's monitoring requirements in civil suit); *St. Louis Developmental Disabilities Treatment Ctr. Parents Ass'n v. Mallory*, 591 F. Supp. 1416, 1440 (W.D. Mo. 1984) (reasoning similarly), *aff'd on other grounds*, 767 F.2d 518 (8th Cir. 1985); *but see Va. Off. of Prot. & Advocacy v. Va., Dep't of Educ.*, 262 F. Supp. 2d 648, 659 n.4 (E.D. Va. 2003) (rejecting the holding of *Beth V.* after concluding the Fourth Circuit, "a strict construction circuit," would likely disagree with the Third Circuit's interpretation).; *cf. R.K., ex rel. T.K. v. Hayward Unified Sch. Dist.*, No. 06-07836, 2007 WL 2778730, at *8 (N.D. Cal. Sept. 21, 2007) (noting conflict between *Virginia Office of Protection* and *Beth V.* but taking no position). This court's 2013 order, which has been positively cited by other courts, has received no negative treatment to date. *See, e.g.*, *Everett H. ex rel. Havey v. Dry Creek Jt. Elementary Sch. Dist.*, 5 F. Supp. 3d 1184, 1194 (E.D. Cal. 2014) (citing 2013 order, finding private right of action against CDE to review complaint resolution proceeding); *Emma C. v. Eastin*, 96-CV-04179-TEH, 2015 WL 5029283, at *5 (N.D. Cal. Aug. 25, 2015), *aff'd sub nom. Emma v. Eastin*, 673 Fed. App'x 637 (9th Cir. 2016) (citing 2013 order, finding private right of action against CDE to challenge state's monitoring system).

/////

/////

CDE argues in its current motion that the court can no longer rely on the authorities finding a private right of action. It argues that after the court's order was filed, "the Ninth Circuit held that §§ 1412(a) and 1415(a) 'do not provide a private right of action' against CDE, and that § 1415(f) 'specifically requires complaints [by individual students and their parents] to be heard in an impartial due process hearing' before a party can bring a civil action." Mem. P. & A. 6 (quoting *Lafayette*, 767 F.3d 860–61) (brackets in original). Plaintiffs do not read *Lafayette* to conflict with the court's 2013 order. Opp'n 7–9. The court likewise finds no conflict.

In *Lafayette*, the Circuit held that "a school district's failure to provide educational testing data to parents violated the procedural requirements of the [IDEA]" and that "the failure to provide the data prevented the parents from meaningfully participating in the creation of [their son's] individualized education program, thereby depriving their son a free appropriate public education." 767 F.3d at 847. As this synopsis suggests, the appeal concerned primarily the application of the IDEA's more specific requirements to one child's education. The case had arrived in federal district court after the boy's parents filed two due process complaints before the OAH and the administrative law judge denied their claims. *See id.* at 850. The parents' federal complaint included claims against the school district, its director, the local board of education, CDE, and the California Office of General Services. *Id.*

Midway through its opinion in *Lafayette*, the Ninth Circuit addressed the parents' claims against CDE. *See id.* at 860–61. Among other matters, the court rejected the plaintiffs' argument that they could prosecute claims under 20 U.S.C. §§ 1412(a) and 1415(a):

> The parents argue that they can state a claim against the Department of Education for breach of its duties under §§ 1412(a) and 1415(a) of the IDEA. However, the district court correctly determined that those provisions do not provide a private right of action. Section 1412 discusses the policies and procedures that a state is required to have in place in order for the state to be eligible for assistance under the IDEA, and § 1415 is a mandate for a state to establish procedural safeguards. Neither section contains a private right of action, and indeed § 1415(f) specifically requires complaints to be heard in an impartial due process hearing and then provides an express right of appeal for review of any administrative decision.

/////

11

Thus, the district court did not err in dismissing all claims against the Department of Education.

*Id.* at 860–61 (footnote omitted). In a footnote, the court declined to address whether the IDEA impliedly creates a right of action. *Id.* at 860 n.8.

The Ninth Circuit's brief discussion of the claims in *Lafayette* offers little guidance in this case, where the plaintiffs are not individuals, advance claims of system-wide failures, and argue persuasively that the administrative processes outlined in § 1415(f) and federal regulations would do nothing to address their concerns. The *Lafayette* court also expressly declined to consider whether a private right of action could be implied from the IDEA's provisions. The case provides no indication the Ninth Circuit would disagree with the rationale identified in the Third Circuit's opinion in *Beth V.*, for example, which concerned claims more closely analogous to those of this case. It is improbable the *Lafayette* court intended to create a circuit split in its single-paragraph discussion of readily distinguishable factual circumstances.[4] *See Everett H v. Dry Creek Jt. Elementary Sch. Dist.*, 2:13-CV-00889-MCE-DB, 2016 WL 5661775, at *10 (E.D. Cal. Sept. 30, 2016) (rejecting CDE's argument that *Lafayette* forecloses a private right of action against CDE to review complaint resolution proceeding); *Emma C. v. Eastin*, 2015 WL 5029283, at *5 (noting *Lafayette* did not overrule its prior finding, made in accord with this court's 2013 Order, that the IDEA allows a private right of action for disabled students).

CDE also argues, independently of its citation of *Lafayette*, that this case is not authorized by § 1415(i)(2). *See* Am. Reply 3–4. CDE reads that section, along with subsections (b)(6) and (f), to impose two limits on a private plaintiff's rights. First, it argues that § 1415(i)(2) comes into force only after the conclusion of a state education agency's complaint procedure. The court found previously that the plaintiffs were not required to exhaust their administrative

---

[4] The court notes that in its appellate briefing before the Ninth Circuit in *Lafayette*, CDE argued *Beth V.* was distinguishable. *See* CDE's Br. 38–45, No. 12-15769 (9th Cir. filed Apr. 5, 2012), Dkt. No. 36. It also argued this case is distinguishable from *Lafayette*, because this case "involve[s] a statewide, systemic challenge in which the court found exhaustion was not required." *Id.* at 45 n.11.

remedies in this way.  2013 Order 13–14.  CDE has not shown why this conclusion was erroneous, and the court declines to reconsider its decision now.

CDE further argues that only parents and local agencies can seek relief under the IDEA, not associations of parents like the plaintiffs here.  On a related note, CDE reads § 1415(i) as not authorizing lawsuits that challenge California's oversight obligations under the IDEA, and argues that § 1415(i) refers instead to concrete decisions about a child's education.

Tension in the words of subsection (b)(6) warrants caution.  That subsection refers to "any party," which suggests any person or entity with standing has a right of action based on § 1415(i), including an association of parents.  Similarly, § 1415(i)(a)(A) refers to "any party aggrieved by" a state's findings or decision.  In contrast, however, subsection (b)(6)(a) refers to "the child," and subsection (b)(6)(B) refers to "the parent or public agency," which could support an argument that "any party" means "any parent or public agency."

Notwithstanding this potential ambiguity, it is difficult to imagine broader language than "any party" and "any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child."  20 U.S.C. § 1415(b)(6).  This choice of words suggests Congress also anticipated private suits in response to statewide, systemic failures in the education of students with disabilities, plainly a "matter relating to" identification, placement, evaluation or provision of a free appropriate public education.  As did the plaintiffs in *Beth V.*, the plaintiffs here raise complaints that "arise[] out of the inability of the children involved to secure a satisfactory education," which "directly implicates 'the provision of a free appropriate public education to such child' as required by [§ 1415(b)(6)]."  87 F.3d at 86.

As noted in this court's 2013 order, Congress was cognizant of this broad language in its decision to adopt specific rules of construction in another IDEA subsection.  When provisions regarding teacher qualifications were added to § 1412, Congress specifically barred private enforcement.  *See* 20 U.S.C. § 1412(a)(14)(E) ("Notwithstanding any other individual right of action . . . nothing in this paragraph shall be construed to create a right of action . . . .").

13

Congress did not adopt similar language to limit private enforcement of the subsections on which the plaintiffs rely in this lawsuit.

Lastly, CDE's motion does not address the detailed discussion of these provisions in *Beth V.*, 87 F.3d at 86–88, and CDE dismisses without analysis several decisions in other federal district courts that cut against its position, as cited above. Nor does CDE address the Ninth Circuit's implicit recognition of a parent's implied right of action under the complaint resolution procedures required by the U.S. Department of Education. *See* 2013 Order 10 (citing *Christopher S.*, 384 F.3d at 1211). CDE's motion cannot be granted on this basis.

### 2. *Armstrong*—The Spending Clause and Private Rights of Action

CDE argues the IDEA does not authorize this lawsuit for other reasons as well: (1) Congress intended for the federal government to withhold funding from states that breach their supervisory obligations under the IDEA, not for private plaintiffs to file lawsuits in federal court; (2) the complexity of the IDEA's requirements show the law can be administered only by an administrative agency with subject-matter expertise; and (3) simultaneous enforcement of the IDEA by private plaintiffs and the U.S. Department of Education threatens CDE with inconsistent or conflicting obligations.

Here, CDE relies primarily on *Armstrong v. Exceptional Child Center, Inc.*, 135 S. Ct. 1378. The plaintiffs in *Armstrong* were healthcare providers who provided services to patients with mental disabilities and were reimbursed with federal Medicaid funds by the State of Idaho. *See id.* at 1382. They sued two state officials and claimed the reimbursement rates Idaho had paid them were lower than Congress permitted in 42 U.S.C. § 1396a(a)(30)(A), a provision commonly cited as § (30)(A) of the Medicaid Act. 135 S. Ct. at 1382–83. Section (30)(A) required Idaho, as it does any state in receipt of Medicaid funding, (1) "to safeguard against unnecessary utilization of [medical] care and services"; (2) "to assure that payments are consistent with efficiency, economy, and quality of care"; and (3) "to enlist enough providers so that care and services are available under the plan . . . ." *See id.* (quoting § (30)(A)). The district court granted summary judgment to the healthcare providers, finding Idaho's rates did not comply with § (30)(A), notwithstanding the court's reluctance "to become entangled in

the management of state government." *Inclusion, Inc. v. Armstrong*, 835 F. Supp. 2d 960, 964 (D. Idaho 2011). The Ninth Circuit affirmed in an unpublished[5] memorandum decision, citing Circuit precedent to hold that Medicaid providers "have an implied right of action under the Supremacy Clause to seek injunctive relief against the enforcement or implementation of state legislation." *Exceptional Child Ctr., Inc. v. Armstrong*, 567 F. App'x 496, 497 (9th Cir. 2014) (citing *Indep. Living Ctr. of S. Cal. v. Shewry*, 543 F.3d 1050, 1065 (9th Cir. 2008))[6]

The Supreme Court agreed to hear the case, 135 S. Ct. 44, and reversed and remanded, 135 S. Ct. 1378. The majority agreed on three points: (1) the Supremacy Clause does not create a private right of action, *id.* at 1383–84; (2) "[t]he ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity," *id.* at 1384; and (3) "the Medicaid Act implicitly precludes private enforcement of § 30(A)," *id.* at 1385–87. This implicit preclusion was evident in two aspects of § (30)(A). First, Congress provided expressly for only one remedy when a state did not uphold its obligations under the Medicaid Act: the withholding of Medicaid funds. *Id.* at 1385. Second, the text of § (30)(A) showed its requirements were not susceptible to administration by judges. *Id.*

Justice Breyer, who joined most of the majority opinion, wrote separately to explain that he did not see the question before the Court as testing the applicability of the Supremacy Clause, but rather "whether federal courts may in these circumstances grant injunctive relief against state officers who are violating, or planning to violate, federal law." *Id.* at 1388 (Breyer, J., concurring in part and concurring in the judgment). He believed the answer was "no," explaining: "That answer does not follow from the application of a simple, fixed legal formula separating federal statutes that may underlie this kind of injunctive action from those that may

---

[5] This court may cite the Ninth Circuit's unpublished appellate dispositions issued on or after January 1, 2007. *See* Fed. R. App. P. 32.1.

[6] The Circuit also cited *Douglas v. Independent Living Center of Southern California, Inc.*, 565 U.S. 606, 614(2012), in which five Justices had declined to consider this question and instead remanded the matter in light of an intervening factual development that made the Supremacy Clause redundant. *See id.* at 613–17. Nevertheless, four justices dissented to explain they would have recognized no private right of action under the Supremacy Clause. *See id.* at 616–24 (Roberts, C.J., dissenting). The same four justices joined the majority in *Armstrong*. Justice Breyer, who wrote the majority opinion in *Douglas*, cast the deciding vote in *Armstrong*.

not." *Id.* Rather, he believed the "broad and nonspecific" mandates of § (30)(A) were better left to federal administrative agencies. *Id.* at 1388–89. He feared that allowing individual enforcement would lead to increased litigation, inconsistent results, and disorder. *Id.* at 1389. It was better in his view to leave the healthcare providers with a remedy under the Administrative Procedure Act. *See id.* at 1389–90.

CDE analogizes § (30)(A) to the IDEA sections that underlie plaintiffs' complaint here. CDE contends the IDEA's admittedly nebulous requirements, such as the requirement to provide an "appropriate" form of free public education, must be enforced by the Executive Branch. CDE's previous motion to dismiss rested on a less refined variation of the same argument. *See* Mem. P. & A. Mot. Dismiss 5–6, 13–14. In that motion CDE relied on the Ninth Circuit's decision in *C.O. v. Portland Public Schools*, 679 F.3d 1162 (9th Cir. 2012), in which the court held that a parent cannot obtain nominal damages under the IDEA. To explain its holding in *Portland Pub. Sch.*, the Circuit first quoted *Alexander v. Sandoval*, 532 U.S. 275 (2001), in which the Supreme Court wrote "a cause of action does not exist and courts may not create one, no matter how desirable that might be as a policy matter, or how compatible with the statute." *Id.* at 1167 (emphasis omitted) (quoting *Alexander*, 532 U.S. at 286–87). And second, the Circuit quoted *Gonzaga University v. Doe*, 536 U.S. 273 (2002), in which the Supreme Court opined "the typical remedy for state noncompliance with federally imposed conditions is not a private cause of action for noncompliance but rather action by the Federal Government to terminate funds to the State." *Id.* (quoting *Gonzaga*, 536 U.S. at 280). In light of these considerations, given the IDEA's "broad requirements" of an "appropriate" education and integration, *id.* at 1165, and in the absence of any legislative history to indicate contrary congressional intent, the *Portland Public Schools* court declined to infer a private right of action to seek nominal damages under the IDEA, *id.* at 1167.

These uncontroversial premises are the same that drove the Supreme Court's decision in *Armstrong*. *See* 135 S. Ct. at 1385 (quoting *Alexander*, 532 U.S. at 290, and *Gonzaga*, 536 U.S. at 292, and explaining that § (30)(A) imposed a "judgment-laden standard" that suggested an intent not to create a private right of action). This court was not previously

16

persuaded by similar citations to grant CDE's prior motion. Unlike in *Portland Schools* and *Armstrong*, the plaintiffs here rely on a provision of the IDEA that creates a private right of action. The IDEA expressly allows parents to seek relief in federal court. 20 U.S.C. § 1415(b)(6). Longstanding exceptions to the rule requiring administrative exhaustion apply here. *See* 2013 Order 13–14. In addition, the dangers of inconsistent obligations and disorder that proved decisive in *Armstrong* are not present here. An injunction directed at CDE would not conflict with oversight by the U.S. Department of Education "any more than an injunction directed at [a school district] conflicts with [CDE's] oversight, and the latter situation is permitted by the text of section 1415 and established precedent." *See id.* at 11–12. The IDEA decisions cited in the previous section suggest private enforcement of the IDEA risks no practical impossibilities of administration. CDE's motion cannot be granted on the basis of the Supreme Court's decision in *Armstrong*.[7]

### 3. The Tenth Amendment

"The powers not delegated to the United States by the Constitution, nor prohibited by it to the states, are reserved to the states respectively, or to the people." U.S. Const. amend. X. "[T]he Tenth Amendment confirms that the power of the Federal Government is subject to limits that may, in a given instance, reserve power to the States." *New York v. United States*, 505 U.S. 144, 157 (1992). It "states but a truism that all is retained which has not been surrendered." *United States v. Darby*, 312 U.S. 100, 124 (1941).

The Tenth Amendment does not prevent Congress from subjecting states to generally applicable laws. *New York*, 505 U.S. at 160 (collecting authority). But Congress may not commandeer a state's legislature by forcing it to enact and administer federal programs. *Nat'l Fed'n of Indep. Bus. v. Sebelius*, __ U.S. __, 132 S. Ct. 2566, 2601 (2012). "[T]he Constitution has never been understood to confer upon Congress the ability to require the States to govern according to Congress' instructions." *New York*, 505 U.S. at 162. "[T]he Framers explicitly

---

[7] It appears CDE was unsuccessful in asserting similar arguments before another California district court last year. *See Emma C.*, 2015 WL 5029283, at *5 (finding *Armstrong* inapposite to CDE's argument that IDEA forecloses a private right of action against CDE).

chose a Constitution that confers upon Congress the power to regulate individuals, not States." *Id.* at 166.

Neither does the Tenth Amendment prohibit Congress from attaching conditions to federal money, so long as those conditions are "in pursuit of the general welfare," are unambiguously stated, bear some relationship to the federal purpose, and offend no other constitutional provision. *See South Dakota v. Dole*, 483 U.S. 203, 206–08 (1987) (citation and quotation marks omitted). Congress may also offer states a choice: regulate according to federal standards, or state law will be preempted. *Hodel v. Va. Surface Min. & Reclamation Ass'n, Inc.*, 452 U.S. 264, 288–90 (1981). In both of these scenarios, "the residents of the State retain the ultimate decision as to whether or not the State will comply." *New York*, 505 U.S. at 168.

Here, CDE argues that if plaintiffs may pursue claims under section 504 of the Rehabilitation Act, Congress will have succeeded in compelling California to enact and enforce a federal program of private oversight. Its argument appears to proceed from the assumption that the IDEA allows no private right of action in a case such as this. *See* Mem. P. & A. 11 ("Construing . . . the Rehabilitation Act . . . to mandate what the IDEA does not (and cannot) require impermissibly adds a condition for federal funding that runs afoul of the anti-commandeering component of the Tenth Amendment."). CDE's assumption conflicts with the court's decision reflected in the previous sections.

Even if CDE were granted judgment on the plaintiffs' IDEA claims, it has not shown the plaintiffs' Rehabilitation Act claims would offend the Tenth Amendment. The Rehabilitation Act is separate from the IDEA and imposes independent conditions on a state's acceptance of federal funds. It applies regardless of whatever other conditions the state legislature decides to impose. If California believes the Rehabilitation Act's general antidiscrimination requirements are too odious, it may turn back the aid conditioned on an intolerable liability.

At bottom, CDE's motion attacks the constitutionality of the Rehabilitation Act generally; CDE argues in effect that California could not have foreseen private lawsuits challenging the discriminatory administration of public education. But CDE's briefing does not

18

explain how the Rehabilitation Act offers California no choice, how it imposes ambiguous conditions, or why section 504 is unrelated to the "general welfare" and a valid federal purpose. CDE does not wrestle with the "elusiveness" of relief under its coercion theory, *Nevada v. Skinner*, 884 F.2d 445, 448 (9th Cir. 1989), and does not consider authority suggesting conditions short of "undue influence," "economic dragooning," or a governmental "gun to the head" are permissible, *Nat'l Fed. Indep. Bus.*, 132 S. Ct. at 2602–05. Its motion cannot be granted on this claim.

4.      Conclusion

The court finds no basis for granting CDE's motion. Neither *Lafayette* nor *Armstrong* require the court to revisit its 2013 Order finding a private right of action for plaintiffs here. CDE's defense under the Tenth Amendment also is unavailing. Because judgment is not granted on plaintiffs' federal claims, CDE's request to deny supplemental jurisdiction over the state claims is moot. The court denies CDE's motion for judgment on the pleadings.

Next, the court turns to plaintiffs' motion for sanctions under Federal Rule of Civil Procedure 16.

## II.      RULE 16 SANCTIONS

Plaintiffs move for sanctions against CDE under Rule 16(f). *See* Mot. Sanctions, ECF No. 206. Plaintiffs assert CDE was "unprepared or unwilling" to participate in pretrial conferences and "routinely ignored" the court's resulting orders. Mot. Sanctions 22. Although the magistrate judge resolved most of plaintiffs' sanction motion, she declined to decide the question of Rule 16 sanctions because this court is the "one to know best whether defendant's counsel really was 'unprepared' at conferences and hearings" and what harm may have resulted. Order August 17, 2016 at 18, ECF No. 229. For the reasons explained below, although the court finds merit to some of plaintiffs' claims, the court declines to impose sanctions here based on plaintiffs' untimely motion.

A.      Legal Standard

The Federal Rules generally encourage the court to engage in early pretrial case management to maximize judicial economy, improve trial preparation, and expedite and facilitate resolution.

19

Fed. R. Civ. P. 16(a); *see also* Fed. R. Civ. P. 16 advisory committee notes to 2015 amendments. Specifically, Rule 16 authorizes the court to conduct mandatory pretrial conferences and issue binding scheduling orders. Fed. R. Civ. P. 16(a)–(e). To enforce the rule, the court may issue "any just orders" if a party or its attorney:

> (A) fails to appear at a scheduling or other pretrial conference;
> (B) is substantially unprepared to participate—or does not participate in good faith—in the conference; or
> (C) fails to obey a scheduling or other pretrial order

Fed. R. Civ. P. 16(f). Rule 16(f) was added to the Federal Rules to sanction "disobedient or recalcitrant" parties and their attorneys. Fed. R. Civ. P. 16(f) advisory committee notes to 1983 amendments Although mere negligence is generally insufficient to warrant sanctions, courts may sanction conduct amounting to "recklessness, gross negligence, repeated—although unintentional—flouting of court rules, or willful misconduct." *Washburn v. Morgado*, 332 F. App'x 380, 383 (9th Cir. 2009) (citing *Zambrano v. City of Tustin*, 885 F.2d 1473, 1480 (9th Cir. 1989)). The court has wide discretion to impose sanctions. *Official Airline Guides, Inc. v. Goss*, 6 F.3d 1385, 1397 (9th Cir. 1993) (citing *Nat'l Hockey League v. Metro. Hockey Club, Inc.*, 427 U.S. 639, 642 (1976)). Instead of or in addition to sanctions, a court can order the party, its attorney, or both to pay reasonable expenses including attorney's fees, incurred because of any noncompliance with Rule 16. Fed. R. Civ. P. 16(f)(2); *see also Goss*, 6 F.3d at 1397 (upholding district court's award of fees incurred by party's corporate representative attending settlement conference when opposing party did not appear with full settlement authority). The court should not order payment of reasonable expenses where noncompliance with the rule is substantially justified or where other circumstances make an award of expenses unjust. Fed. R. Civ. P. 16(f)(2).

### B. Discussion

As an initial matter, plaintiffs' brief in support of its motion for Rule 16 sanctions is not clear about the legal basis for sanctions. Plaintiffs cite only violations under "Rule 16(f)(a)," which does not exist. Mot. Sanctions 22. The court infers plaintiffs intended to refer to Rule 16(f)(1), which includes the entire list of possible violations, rather than 16(f)(1)(A), which

20

is only the first of the list.  Thus, plaintiffs' assertions that CDE was "unprepared or unwilling" to participate in pretrial conferences and meetings apparently allege violations of 16(f)(1)(B), and plaintiffs' assertions that CDE "routinely ignored" resulting orders from this court allege violations of 16(f)(1)(C).  *Id.* at 22.

### 1.    Rule 16(f)(1)(B)

To support their claim that CDE was "unprepared or unwilling" to participate in pretrial conferences and meetings, plaintiffs point to a series of status conferences as well as meet-and-confer meetings starting as early as June 26, 2013.  Mot. Sanctions 10–13.

To the extent plaintiffs argue CDE was unprepared or participated in meetings in bad-faith outside the presence of this court, such as during conference calls and meet-and-confer sessions between counsel, plaintiffs' claim falls outside of the rule.  The express language of Rule 16(f)(1)(A) provides for sanctions for a party or attorney's absence only at a "scheduling or other pretrial conference," and the court construes Rule 16(f)(1)(B) governing lack of preparation or bad faith at "the conference" to similarly be limited to a scheduling or other pretrial conference. *Guru Denim, Inc. v. Hayes*, No. CV 08-4493 SCW (RC), 2010 WL 1854020, at *3 (C.D. Cal. May 6, 2010) (interpreting Rule 16(f)(1)(B) to require an attorney to be prepared for pretrial conferences); *see also FM Indus., Inc. v. Citicorp Credit Servs., Inc.*, 614 F.3d 335, 338 (7th Cir. 2010) (approving sanctions for unpreparedness for a pretrial conference); *United States v. Anthony Med. Associates P.C.*, No. 1:13-CV-353 JVB, 2014 WL 4167490, at *1 (N.D. Ind. Aug. 21, 2014) (dismissing case as sanction for plaintiff's failure to appear at a scheduling conference). The court will limit consideration of plaintiffs' 16(f)(1)(B) claims to the conduct of the parties in the court's presence and will not consider here, for example, plaintiffs' assertions of CDE's recalcitrance during the meet-and-confer process to create a stipulated protective order.  Mot. Sanctions 11–12.

Plaintiffs' strongest support for sanctions under 16(f)(1)(B) comes from the record of a series of status conferences held before this court regarding the issue of notice to students and their parents and families.  Mot. Sanctions 11–14.  During a status conference on September 19, 2013, counsel for CDE raised the issue of notice to students and their parents and families as one

that CDE was "trying to figure out." Hr'g Transcript Sept. 19, 2013 at 5, ECF No. 41 ("Are we going to need to individually inform all of the parents . . . ?"). When, at a status conference held on February 20, 2014, the court asked CDE whether notice by publication would be effective, CDE was not prepared to discuss the relevant law. Hr'g Transcript Feb. 14, 2014 at 8, ECF No. 48 ("Well, that's exactly what we're grappling with, Your Honor. So we had not looked into the notice by publication provision, and I would be happy to look into that and convey our findings to the Court."). As a result, the court issued an order giving CDE until April 8, 2014 to provide plaintiffs with a proposed form of notice. Order Feb. 20, 2014 at 2, ECF No. 47 (explaining "CDE were not prepared" to address notice issue). And yet, during a status conference held on April 30, 2015, CDE attorneys again were unprepared to address questions related to notice by publication. Hr'g Transcript Apr. 30, 2015 at 3, ECF No. 100 ("I'm sorry, your Honor. I did not bring my notes on all the different particular statutory grounds [regarding consent from anyone whose personal information may be disclosed], so I honestly can't answer that right now."). Only after the court ordered targeted briefing on the issue of consent and notice, more than a year after CDE initially committed to sharing its findings regarding the issue, did CDE finally provide a basis for its position opposing notice by publication. Def.'s Brief, ECF No. 104.

Although, for reasons explained below, the court declines to impose sanctions at this juncture on the basis of laches, CDE is cautioned that the court will entertain more timely motions for sanctions, or impose them *sua sponte* under Rule 16(f), should its foot-dragging continue.

        2.    Rule 16(f)(1)(C)

To support their claim that CDE "routinely ignored" the court's orders, plaintiffs point to six orders over the last two years with which they say CDE failed to comply. Mot. Sanctions 10–12, 17. Only the first four were orders issued by this court: (1) the February 20, 2014 order requiring production, (2) the May 5, 2014 protective order, (3) the February 10, 2015 order regarding discovery, and (4) the November 3, 2015 order regarding e-discovery. The magistrate judge's sanctions order discussed CDE's compliance with each of these prior orders in the context of deciding plaintiffs' motion for sanctions under Rule 37. Because the court declines

to impose sanctions at this juncture, the court does not fully examine plaintiffs' claims under Rule 16(f)(1)(C) other than to make the following observations about CDE's failure to meaningfully "meet and confer."

The magistrate judge reasoned that this court's orders dated February 10, 2015 and November 3, 2015, both of which required the parties to meet and confer, did not require CDE to provide or permit discovery and therefore fell outside the scope of Rule 37. Order Aug. 17, 2016 at 16. The court does not evaluate the magistrate judge's determination here. However, the magistrate judge discussed further CDE's failure to meet and confer before filing its June 2016 motion for protective order, which the magistrate judge denied. *Id.* at 2–3. CDE's meet-and-confer efforts, the magistrate judge wrote:

> consisted of "a two-minute" phone call in which defendant's counsel simply demanded that plaintiffs give in to the motion defendant was about to file. That is not what is meant by "meet and confer" . . . . Counsel's simply stating that they are going to file a motion, and demanding that the opposing party do what the motion requests, is not an attempt to resolve the dispute short of court action. . . . Defendant is cautioned that the "meet and confer" requirement is a substantive prerequisite for filing a discovery motion. It is not simply a couple of sentences to be inserted in a Joint Statement and declaration.

*Id.* at 3–4.

The magistrate judge enforced the meet and confer requirement included in the local rules and standing orders of both the district judge and magistrate judge in this case. *See* Local Rule 251(b) (parties must have "conferred and attempted to resolve their differences"); Civil Standing Order for Judge Mueller ("Prior to filing a motion in a case where the parties are represented by counsel, counsel shall engage in a pre-filing meet and confer to discuss thoroughly the substance of the contemplated motion and any potential resolution."); Standard Information for Judge Claire (parties must meet and confer "in an attempt to resolve the dispute"). The court again underscores its willingness to entertain more timely motions for sanctions should the magistrate judge's admonishment insufficiently motivate meet and confer efforts in the future.

/////

3.      Laches

Notwithstanding the merits of certain of plaintiffs' requests for sanctions, the court finds plaintiffs' motion to be barred by laches.

Laches is an equitable defense that prevents a party, who "with full knowledge of the facts, acquiesces in a transaction and sleeps upon his rights." *Danjaq LLC v. Sony Corp.*, 263 F.3d 942, 950–51 (9th Cir. 2001) (quoting *S. Pac. Co. v. Bogert*, 250 U.S. 483, 500 (1919) (McReynolds, J., dissenting))..  To successfully establish laches, a party must show (1) there was inexcusable delay in the assertion of a known right and (2) the party asserting laches has been prejudiced.  *O'Donnell v. Vencor Inc.*, 466 F.3d 1104, 1112 (9th Cir. 2006).  If the elements of a laches defense are met, a court may dismiss an entire case, dismiss certain claims, or restrict the damages available to the plaintiff.  *E.E.O.C. v. Timeless Investments, Inc.*, 734 F. Supp. 2d 1035, 1067 (E.D. Cal. 2010); *see also Derek & Constance Lee Corp. v. Kim Seng Co.*, 467 F. App'x 696, 697–98 (9th Cir. 2012) (affirming denial of request for contempt order as barred by laches).

The Ninth Circuit has implicitly recognized a court's ability to raise the doctrine of laches *sua sponte*.  *See Sw. Voter Registration Educ. Project v. Shelley*, 344 F.3d 914 (9th Cir. 2003) (en banc) (affirming district court's decision, relying in part on court's *sua sponte* invocation of laches, to deny preliminary injunction); *see also Romans v. Incline Vill. Gen. Imp. Dist.*, 482 F. App'x 292, 293 (9th Cir. 2012); *Rodriguez v. Pierce Cty.*, 267 F. App'x 556 (9th Cir. 2008).  Other circuits have expressly approved a court's *sua sponte* power to raise laches. *See Carson v. Burke*, 178 F.3d 434, 437 (6th Cir. 1999) (affirming district court's *sua sponte* application of laches to habeas claim); *What-A-Burger Of Virginia, Inc. v. Whataburger, Inc. Of Corpus Christi, Texas*, 357 F.3d 441, 444 (4th Cir. 2004) (affirming district court's granting summary judgment *sua sponte* on basis of laches).  The only limit the Ninth Circuit appears to have placed on the *sua sponte* application of laches is in circumstances in which parties lack notice about an issue and are not given an opportunity to address it.  *In re Panther Mountain Land Dev., LLC*, 686 F.3d 916, 928 (8th Cir. 2012) (reversing bankruptcy court's *sua sponte* application of laches because debtor never addressed reasonableness of bank's delay and bank was not on notice to justify its delay); *Foster Poultry Farms, Inc. v. SunTrust Bank*, 377 F. App'x

665, 669–70 (9th Cir. 2010) (unpublished)[8] (reversing district court's *sua sponte* application of laches to limit party's disgorgement award because affirmative defense was not pled as an affirmative defense). Here, plaintiffs were notified about the issue of timeliness prior to hearing, ECF No. 254, and were given an opportunity to address the issue at hearing, Hr'g Transcript Oct. 7, 2016 at 17–23, ECF No. 259. Thus, the court may invoke laches *sua sponte* here.

The application of laches depends on a close evaluation of the particular facts in a given case. *Couveau v. Am. Airlines, Inc.*, 218 F.3d 1078, 1083 (9th Cir. 2000). Generally speaking, relevant delay is the period from when the plaintiff knew or should have known of the allegedly offending conduct. *Danjaq*, 263 F.3d at 952. In determining reasonableness of delay, courts look to the cause of the delay. *Id.* at 954. For example, the Ninth Circuit upheld a trial court's denial of a contempt order as barred by laches because plaintiff knew for at least a year that defendant was violating the injunction and waited another five months to bring a contempt proceeding. *Derek*, 467 F. App'x at 697–98.

The court finds, applying the two *O'Donnell* requirements, plaintiffs' motion is barred by laches. First, plaintiffs do not adequately justify the delay in their motion. Plaintiffs' briefs offer no reason for their delay. When asked at hearing, plaintiffs explained that they believed the court had previously forbidden discovery motions, including a motion for sanctions. It is true the court temporarily ordered the parties to refrain from filing any discovery motions before the magistrate judge until the court approved a new fact discovery schedule. Order Feb. 9, 2015, ECF No. 91. However, that stay was lifted several months later. Minute Order Oct. 16, 2015, ECF No. 124. Plaintiffs' claims here involve status conferences from as early as February 2014, a year before the start of the temporary stay. Moreover, plaintiffs' current motion for sanctions was filed in June 2016, ECF Nos. 197, 201, approximately eight months after the stay was lifted. Plaintiffs' delay is inexcusable. Second, CDE is prejudiced as a result of plaintiffs' delay. Plaintiffs' motion relies on CDE's behavior before this court over the last two and half years. Plaintiffs' delay in bringing their motion undermines CDE's ability to defend itself and

<hr>

[8] As noted, this court may cite the Ninth Circuit's unpublished appellate dispositions. *See* Fed. R. App. P. 32.1, *supra* note 5.

1  inhibits this court's ability to evaluate both parties' arguments. Because plaintiffs' delay satisfies

2  both *O'Donnell* requirements, the court finds laches bars plaintiffs' motion for sanctions under

3  Rule 16.

4          The court's ruling here is consistent with the magistrate judge's order concerning

5  the other portions of plaintiffs' motion. *See* Order Aug. 17, 2016. In that decision, the magistrate

6  judge considered plaintiffs' motion for sanctions under Rule 37(b)(2) for defendant's failure to

7  obey "five discovery orders," *id.*at 14–17, the first four of which form the basis of plaintiffs' Rule

8  16(f) argument here. The magistrate judge declined to impose sanctions under Rule 37(b)(2)

9  because each of the district court's "discovery orders" fell outside of the rule. *Id.* As Rule

10 37(b)(2) did not apply, the magistrate judge never reached the issue of the timeliness of plaintiffs'

11 claims regarding the "discovery orders" under Rule 37(b)(2). The court's ruling here is also

12 consistent with the magistrate judge's ruling under Rule 37(a)(5)(A). *See id.* at 17-18. The

13 magistrate judge did award a fraction of the plaintiffs' requested attorneys' fees under Rule

14 37(a)(5)(A) because the court had granted a portion of plaintiffs' motion to compel. *Id.*at 14–18.

15 That motion to compel, however, was granted on January 26, 2016, less than five months before

16 plaintiffs filed their motion; plaintiffs' successful portion of their sanctions motion was therefore

17 timely in a way the portion reviewed here is not.

18          In sum, plaintiffs' claims here invite this court to consider defendant's conduct

19 over the last thirty months, at the very least. For the reasons discussed above, the court declines

20 to accept that invitation.

21 III.    <u>CONCLUSION</u>

22          CDE's motion for judgment on the pleadings is DENIED.

23          Plaintiffs' motion for sanctions under Rule 16 is DENIED.

24          This order resolves ECF Nos. 172 and 206.

25          IT IS SO ORDERED.

26  DATED: June 14, 2017.

27

28  _____
    UNITED STATES DISTRICT JUDGE